STATE OF CONNECTICUT *v.* CHRISTOPHER CORTES
(AC 23668)

Lavery, C. J., and Foti and McLachlan, Js.

Argued March 31—officially released July 20, 2004

---

*Adele V. Patterson,* assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Cynthia S. Serafini,* assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Christopher Cortes, appeals from the judgment of conviction, rendered after a jury trial, of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a) and assault in the second degree in violation of General Statutes § 53a-60 (a) (2).[1] The defendant claims that the trial court improperly (1) violated his rights to present a defense and to confront the witnesses against him by excluding evidence regarding the sexual nature of the relationship between the complainant and himself, (2) violated his due process right to a fair trial during its jury charge by referring to the complainant as "the victim," (3) allowed the complainant's mother to testify that she believed the complainant's assertion that the defendant had threatened to kill the complainant and (4) imposed a standing criminal restraining order against him under

---

[1] The court sentenced the defendant to a total effective term of ten years imprisonment. The state also charged the defendant with one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C). The jury found the defendant not guilty of those charges.

General Statutes § 53a-40e, a statute that does not apply and is unconstitutionally vague. We agree with the defendant's first two claims and, accordingly, reverse the judgment of the trial court and remand the case for a new trial.[2]

The following relevant facts and testimony were elicited at trial. The defendant, then twenty-three years old, and the complainant, then sixteen years old, began dating in January, 2001. Their relationship lasted until April 25, 2001. The complainant and the defendant presented very different versions of events that transpired immediately thereafter, which underlie this appeal.

The complainant testified that she ended the relationship because the defendant was very possessive of her and did not permit her to do as she pleased. She testified that the defendant did not accept that the relationship was over. The complainant testified that during the late afternoon of April 29, 2001, the defendant called her at her home. She recalled that she was on another telephone line and, when she switched to answer the defendant's call, she overheard the defendant saying, apparently to someone else, "I'm going to f'ing kill her." The complainant hung up the telephone, and immediately thereafter, the defendant called her again and threatened to kill her. The complainant's friend, D, testified that she was with the complainant when the complainant received that call and that she overheard the defendant threaten to kill the complainant "because he wanted to be with her and that if he couldn't be with her, nobody else could." At trial, the complainant's mother testified that the complainant thereafter called her and told her that the defendant had threatened to kill the complainant.

The complainant further related that on returning home from school the following afternoon, she encoun-

---

[2] Because we conclude that a new trial is necessary, we deem it unnecessary to address the defendant's third and fourth claims.

tered the defendant, who was waiting for her in a car parked near her home. The complainant testified that she refused to speak with him and that she went inside her home, went to her bedroom and picked up her telephone to call her mother. The complainant recalled that the defendant had followed her inside and was standing in her bedroom. The defendant hit the telephone from her hands, threw her onto her bed and crawled on top of her. The defendant produced a knife and held it close to her, screaming at her to the effect that if he could not be with her, nobody could. The defendant then stabbed the complainant in the chest, causing minor injury. As the defendant attempted to stab the complainant a second time, the complainant grabbed and bent the knife's blade, causing her to sustain cuts on her hands.

The complainant further testified that after the defendant briefly "calmed down," he again threw her to the bed and stabbed her a second time, this time in her back, causing moderate injury. The complainant attempted to calm the defendant, and the defendant told her that they could either leave the scene together or that he was going to kill her. The complainant, motivated by a concern for her safety, agreed to leave with the defendant. The defendant led her to his car, holding a knife to her neck.

The complainant testified that the defendant drove her to his apartment where his brother, Raphael Cortes, joined them. The defendant forced the complainant to sit in the backseat of the automobile with him while his brother drove. The defendant told the complainant that he was taking her to Lawrence, Massachusetts, to visit his aunts. On the drive to Lawrence, the complainant, at the defendant's instruction, called her mother on a cellular telephone and told her that she loved the defendant, wanted to be with him and was going to

New Hampshire with him.[3] The complainant's mother testified that she asked to speak to the defendant and told him that if he did not bring her daughter back, she was "going to get him for kidnapping." The complainant's mother further testified that the defendant told her that the complainant wanted to be with him.

The complainant's mother testified that she thereafter called her boyfriend, Ron Nihill, a sergeant with the Connecticut state police. Nihill reported the matter to the state and local police. Luis Cruz, a friend of the defendant, later called the complainant's home and conveyed information to the complainant's mother and Nihill concerning the complainant's likely whereabouts in Lawrence, as well as information about the car that the defendant was using.[4] Nihill relayed that information to police in Connecticut and Massachusetts.

Michael Montecalvo, a police officer with the Lawrence police department, testified that, at approximately 8 p.m., he located the defendant's unoccupied car parked along a street in Lawrence. After driving around the area in which the car was parked, Montecalvo noticed that the car was being driven. Montecalvo followed the car and ultimately stopped it once detectives arrived to assist him. Montecalvo testified that the complainant was driving the car, with the defendant in the passenger seat. Montecalvo also testified that the complainant told him that she had been kidnapped and that he immediately observed wounds on her hands and back. Montecalvo called for medical assistance and later found a knife with a bent blade under the driver's seat of the car. The defendant's arrest followed.

[3] The complainant testified that the defendant instructed her to tell her mother that she was going to Pennsylvania with the defendant, but that she instead told her mother that she was going to New Hampshire.

[4] Cruz' sister had rented the car that was used by the defendant. The defendant admitted that he had used the car without permission.

The defendant also testified and presented the testimony of twelve other witnesses. The defendant testified that he ended his relationship with the complainant because he lost interest in her, partly because she had lied to him about her age. The defendant testified that he knew that his relationship with the sixteen year old complainant was wrong, that he learned that Nihill was a state police trooper and that he was "very worried" that Nihill would find out about his relationship with the complainant. According to the defendant, the complainant was unable to accept that the relationship was over, and she cried and begged him not to end their relationship. The defendant testified that he went to the complainant's house on April 30, 2001, encountered the complainant when she got off of the school bus and asked her if he could take some of his clothing, which he had kept at her house. He testified that he went inside the house with the complainant, who was upset and kept asking him not to end the relationship. The defendant recalled that he waited in the living room for a short time before going upstairs to the complainant's bedroom. He found the complainant lying on her bed, crying and telling him not to leave her. When he turned toward the closet, the complainant approached him and began hitting and scratching him. She told him that she hated him. The defendant testified that the complainant then "started to kick me in my oranges" and that he responded by pushing her away. The complainant fell back after tripping on a blanket, hitting her back on a nearby nightstand.

The defendant further testified that the complainant thereafter armed herself with a piece of broken mirror glass, which she held to her chest. The complainant threatened to kill herself and told the defendant that she could not continue to live "like this." The defendant testified that he placed the complainant on the bed and pulled her hands apart to remove the glass from her

grip. At that point, the complainant sustained cuts on the palms of her hands. The defendant tended to the complainant's wounds and apologized for pushing her. He testified that he began to feel "scared" and "responsible" for the complainant's distraught condition and suggested that she accompany him to Lawrence to visit his family. He told the complainant that he was going to live there and that during the summer, she could come and stay with him there.

The defendant denied stabbing, restraining or abducting the complainant. He testified that he asked the complainant to accompany him to Massachusetts "to calm her down and make her feel happy," and that the complainant voluntarily accompanied him to Lawrence with his brother, who knew the directions to get there. The defendant explained that he took a kitchen knife from his apartment when he left the apartment and used it, as he commonly did, as a door key, to loosen and tighten screws on the apartment door's latching mechanism. The defendant recalled speaking with the complainant's mother during the trip to Lawrence, that the complainant's mother accused him of kidnapping her daughter and that he informed her that she should speak with her daughter about the trip, not him. The defendant testified that both he and the complainant visited with his friends and ate dinner at his aunt's house in Lawrence. The defendant testified that the complainant was in the act of voluntarily moving his car, which had been double-parked near a friend's house, when Montecalvo stopped him and the complainant. Additional facts will be presented as necessary.

I

The defendant first claims that the court improperly excluded evidence of the sexual nature of the relationship between the complainant and himself. We agree.

The record discloses the following events underlying the defendant's claim. During cross-examination of the complainant's mother, the defendant attempted to elicit testimony concerning what she knew about the relationship between the complainant and the defendant. When the defendant's counsel inquired concerning whether the complainant's mother knew that the complainant and the defendant had engaged in a sexual relationship, the prosecutor objected, and the court sustained the objection. The state thereafter filed a motion in limine seeking to preclude the defendant from offering any evidence concerning the complainant's sexual relationships absent "an offer of proof that such evidence is admissible and that the probative value outweighs its prejudicial effect."

The court heard argument on the state's motion. The defendant argued that the evidence was relevant to the emotional mindset of the complainant and the defendant as well as to the status of their relationship before the incident. Further, the defendant argued that the evidence was relevant to discrediting the testimony of the complainant's mother, who had testified that the complainant and the defendant had not spent "the night together." The court ruled that the defendant could seek to introduce any such evidence outside of the jury's presence and that the court would determine, at such time, whether the probative value of such evidence outweighed its prejudicial effect.

On the next day of trial, the defendant gave notice of his intention to question witnesses concerning sexual relationships between (1) the complainant and the defendant, (2) the complainant and the defendant's brother, and (3) the defendant and the complainant's friend, D. The defendant represented that evidence of a sexual relationship between himself and the complainant was relevant to the emotional state and motives of the parties, to show the "intensity of feelings" between

the parties. The defendant also sought to introduce that evidence to discredit the testimony of the complainant's mother. The defendant argued that evidence of a sexual relationship between him and D, a prosecution witness, was probative of D's alleged bias and probative because it made it likely that D would have "tough feelings" concerning the defendant. Finally, the defendant argued that evidence of a sexual relationship between the complainant and his brother was relevant to undermining the complainant's version of events and, specifically, her testimony that the defendant had forced her to accompany him and that she was unable to seek help during the drive to Lawrence.

The court granted the state's motion, precluding evidence of the sexual relationships that the defense sought to introduce as evidence. The court stated that "relationships are an appropriate area of inquiry between people when they testify because it may go to the issue of motive, bias, prejudice, which is also appropriate for examination." The court, however, explained that *sexual* relationships were different and implicated other concerns. The court explained to the defendant's attorney: "You are correct when you say that this is not a sexual assault case, but I think the court can take direction from what our legislature has established when it enacted the rape shield law, which, as you know, involves a sexual assault case and the limited, the very limited disclosure of sexual contact between the accused in a sexual assault case and the victim, the limited disclosure that can only come in as to a certain specific issue, consent." The court reasoned that because the legislature had so limited the admissibility of evidence of sexual contact in sex assault cases, such evidence was "even less relevant" in a case that did not concern sexual assault.

The defendant thereafter sought to introduce four letters written to him by the complainant as evidence

of her state of mind toward him ·shortly before April 30, 2001.[5] The court excluded one of the letters partially on the ground that the subject matter of the letter concerned the sexual relationship between the complainant and the defendant.[6]

The defendant's attorney also made an offer of proof, through the defendant, concerning the defendant's relationship with the complainant. The defendant testified that when he was in the complainant's bedroom on April 30, 2001, the complainant was upset with him because he told her that he was going to leave Connecticut to live in Massachusetts. The defendant testified that the complainant was crying and told him that she could not "believe" that he was "doing this after she gave it up to [the defendant] . . . ." The complainant told him that she did not want him to leave. The defendant also testified that the complainant then told him something that "scared him," that she was pregnant. The defendant further testified that he offered to take the complainant to Lawrence with him because he did not want the complainant's mother or Nihill to "get involved" and that, feeling responsible, he "came up with a solution to make [the complainant] happy . . . ." The defendant offered that evidence to show the effect of the complainant's remarks on him, as well as to demonstrate the complainant's state of mind and alleged bias toward him. The state argued that the court

[5] The court admitted two of the letters, exhibit P, dated February 2, 2001, and exhibit Q, dated March 28, 2001. The court excluded another letter, exhibit R for identification, dated April 11, 2001, because it determined that the letter contained hearsay. The court excluded the fourth letter, exhibit S for identification, also dated April 11, 2001, on the grounds discussed herein.

[6] The letter, dated April 11, 2001, stated in relevant part: "Hi Sweetie! What's up? I am really happy that you moved home. I am going to ask my mom if I can sleep over tomorrow night. I wish that I could spend every minute of every day with you. I love you so much. I wanna spend the rest of my life with you. I can not wait for the day I say 'I do!' I also can not wait until we get to live together. Well baby, I gotta go because the bell is gunna ring any minute. I love you! 4-life!"

should exclude the evidence because it would "smear" the complainant and "impugn" her character, and the state objected because the nature and circumstances of the relationship and the statements made by the complainant were not relevant.

The court disallowed the proffered evidence. The court stated: "[T]he specific acts that are claimed to be offered as it relates to sexual intercourse are not appropriate in this setting. . . . [R]eference is made to my citing of the rape shield law and its relevance on a sexual assault case. This is not a sexual assault case. If you're going to the state of mind of the victim, obviously, I've given you thus far . . . and I don't think you can take umbrage with that, sufficient leeway to establish the basis of the relationship, the involvement of the relationship. You can get into areas that she was upset about the breakup, things of that sort, but the court feels that those two areas, give it up for him and that she was pregnant, go beyond the bounds of what the court feels is appropriate in this case, feels that it is prejudicial, also feels that it's being offered for additional information other than for state of mind for the truth, and that is hearsay and it also is prejudicial, and the court feels that it's not appropriate. You have my ruling maintained on the motion in limine."

"Our standard of review for evidentiary matters allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation

marks omitted.) *State* v. *Bridges*, 65 Conn. App. 517, 521, 782 A.2d 1256, cert. denied, 258 Conn. 934, 785 A.2d 230 (2001).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible. . . .

"There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Citations omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 645–46, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

We conclude that the court improperly excluded relevant evidence as to the intimate relationship between the complainant and the defendant. "The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest

secured by confrontation is the right to cross-examination . . . .

"The right of confrontation is preserved if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Abernathy*, 72 Conn. App. 831, 836, 806 A.2d 1139, cert. denied, 262 Conn. 924, 814 A.2d 379 (2002).

The court correctly recognized that "relationships are an appropriate area of inquiry between people when they testify because it may go to the issue of motive, bias, prejudice, which is also appropriate for examination," and that this case was not a prosecution for a sexual assault. The court, nevertheless, was guided in its rulings by the rape shield statute[7] and concluded that "if the legislature felt [that evidence concerning sexual relationships] was limitedly relevant in a sexual assault case, the court takes direction that it's even less

---

[7] This court recently stated: "[I]n cases involving sexual crimes, [t]he rape shield statute [General Statutes § 54-86f] was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . We must remember that [t]he determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case. . . . In every criminal case, the defendant has an important interest in being permitted to introduce evidence relevant to his defense. . . . Whenever the rape shield statute's preclusion of prior sexual conduct is invoked, a question of relevancy arises. If the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense. . . . If the defendant's offer of proof is sufficient to show relevancy, and that the evidence is more probative to the defense than prejudicial to the victim, it must be deemed admissible at trial. . . . When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, [despite what might be considered a sufficient offer of proof] such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." (Internal quotation marks omitted.) *State* v. *Sells*, 82 Conn. App. 332, 354–55, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004).

relevant when we're dealing with a nonsexual assault case."

We agree with the defendant that under the circumstances of this case, the court's attempt to protect the complainant's reputation precluded him from confronting his accuser. The defendant's right to confront the complainant encompassed his right to cross-examine her vigorously for purposes of his defense. The excluded evidence was relevant to assessing the credibility of the parties and their motives. The evidence tended to corroborate the defendant's version of events, especially the fact that the complainant was distraught over the end of the relationship and that he had invited her to accompany him to Lawrence in direct response to what he claims the complainant told him in her bedroom and in an effort to calm her emotional state. Likewise, the evidence was relevant to assessing the complainant's version of events concerning the relationship between her and the defendant and what occurred between them. Stated generally, the fact finder reasonably might have viewed the evidence of the events that transpired on April 30, 2001, from a different perspective than it would have absent such evidence.

The exclusion of that probative evidence was especially detrimental here, where assessing credibility was the key issue in the case. The jury had before it two versions of what transpired between the complainant and the defendant after their relationship ended. In light of the fact that the relationship between the complainant and the defendant lay at the heart of this case, the excluded evidence was most relevant, and the court abused its discretion in excluding it.[8] Further, we are

[8] The defendant's claim on appeal encompasses the court's exclusion of evidence of a sexual relationship "between witnesses for the state and defense . . . ." On remand, we leave the issue of the admissibility of any evidence related to any other sexual relationships, between witnesses for the state and witnesses for the defense, to the court's sound discretion in light of our holding today. We likewise leave the issue of the admissibility

persuaded that the exclusion of that evidence, in all likelihood, affected the jury's verdict against the defendant, as it went to the heart of his defense. We therefore reverse the court's judgment and remand the case for a new trial.

## II

The defendant next claims that the court violated his due process right to a fair trial by referring to the complainant as "the victim" during its jury charge. We agree.

The record reflects that during the course of the trial, numerous witnesses referred to the complainant as "the victim." The defendant objected to the use of that terminology during the state's examination of one witness, and the court overruled the objection. The court later explained its ruling outside the jury's presence: "This [objection] has been raised on the ninth witness in this trial. I just wanted for consistency sake, the court felt it appropriate to maintain what has been presented to the jury rather than change with the ninth witness during the course of this trial."

The prosecutor referred to the complainant as "the victim" numerous times during closing arguments. During its charge, the court referred to the complainant as "the victim" many times.[9] After the court delivered its charge, the defendant's attorney objected to the court's use of the term "victim" in reference to the complainant. Although the defendant did not specifically request that the court deliver a curative instruction, the court, after noting the objection, made it clear that it would not deliver such an instruction.[10]

of the letters marked as exhibits R and S, both marked for identification only, to the court's sound discretion.

[9] The defendant claims that the court referred to the complainant as "the victim" as many as eighty times.

[10] The defendant's attorney objected to the court's reference to the complainant as "the victim," and the court, in noting the defendant's exception to the charge, stated: "I'm not going to readdress [this issue]." The court

The defendant now claims that the instructional references infringed on his right to a fair trial in that they impaired his defense, deprived him of the presumption of innocence, invaded the fact-finding function of the jury and reflected that the trial judge was not impartial. As the defendant correctly points out, the jury was called on to determine if the complainant was a "victim" of any crime. The jury's function was to determine if, in fact, any crime had been committed.

"In determining whether a trial court's charge satisfies constitutional requirements . . . individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Jones*, 82 Conn. App. 81, 86, 841 A.2d 1224, cert. denied, 269 Conn. 912, 852 A.2d 741 (2004).

"The principles guiding a trial judge in conducting a criminal trial are well established. Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the

did not offer to deliver a curative instruction to the jury but, rather, directly refused to revisit the issue. Compare *State* v. *Robinson*, 81 Conn. App. 26, 29–33, 838 A.2d 243 (defense counsel's refusal of court's offer to deliver curative instruction regarding term "victim" constituted waiver), cert. denied, 268 Conn. 921, 846 A.2d 882 (2004).

judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.) *State* v. *Lopes*, 78 Conn. App. 264, 274, 826 A.2d 1238, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003). "The trial court should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of any approbation for the prosecution's." (Internal quotation marks omitted.) *State* v. *Vargas*, 80 Conn. App. 454, 460, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004). In commenting on, or marshaling, evidence during its charge, the court is under a duty to provide a fair summary of the evidence and to demonstrate strict impartiality. *State* v. *Thompson*, 81 Conn. App. 264, 282, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004).

In cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term "victim" is not inappropriate. In cases in which the fact that a crime has been committed is contested, and where the court's use of the term "victim" has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief that a crime has been committed against the complainant.

We agree with the defendant that given the particular circumstances of this case, as well as the fact that the

complainant's credibility was a critical issue, the better practice would have been for the court to refer to the complainant by some term other than "victim." We conclude that the court's instructions constituted reversible error. Although the defendant did not ask the court to deliver a curative instruction after the court delivered its charge, the court made it clear that it would not deliver such an instruction when the defendant raised his objection to the charge.

We also ask whether any prejudicial effect of the court's use of the term "victim" was negated by the court's other instructions to the jury. *State* v. *Robinson*, 81 Conn. App. 26, 32–33, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004). We are confident that the court's other instructions could not have negated such effect under these circumstances, in which the jury faced two conflicting versions of events and had to credit one witness' word over that of another witness.

Accordingly, we agree with the defendant that the court's instructions deprived him of his right to a fair trial. The court's use of the term "victim" in reference to the complainant, under the particular circumstances of this case, may have invaded the fact-finding function of the jury concerning the issue of whether a crime had been committed and, therefore, constitutes reversible error.[11]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

[11] In so concluding, we are, nevertheless, mindful that the jury found the defendant not guilty of the kidnapping charges brought by the state.