## STATE OF CONNECTICUT *v.* CHRISTOPHER CORTES
### (SC 17255)

Sullivan, C. J., and Borden, Norcott, Vertefeuille and Zarella, Js.

Argued September 7—officially released November 22, 2005

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Cynthia Serafini*, assistant state's attorney, and, on the brief, *John A. Connelly*, state's attorney, for the appellant (state).

*Adele V. Patterson*, assistant public defender, for the appellee (defendant).

*Opinion*

NORCOTT, J. The state appeals, upon our granting of its petition for certification,[1] from the judgment of the Appellate Court reversing the convictions of the defendant, Christopher Cortes, of one count of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2). *State* v. *Cortes*, 84 Conn. App. 70, 851 A.2d 1230 (2004). We conclude that the Appellate Court correctly deter-

---

[1] We granted the state's petition for certification limited to the following issues: "1. Did the Appellate Court properly conclude that the trial court's instructional references to the complainant as 'the victim' deprived the defendant of his right to a fair trial?

"2. Did the Appellate Court properly conclude that the trial court improperly excluded evidence of the sexual nature of the relationship between the defendant and the complainant and, if so, did the Appellate Court also properly conclude that the impropriety was not harmless?" *State* v. *Cortes*, 271 Conn. 917, 859 A.2d 571 (2004).

mined that the trial court improperly granted the state's motion in limine to exclude evidence of the sexual nature of the relationship between the defendant and the complainant, and that such exclusion was not harmless error. Id., 76. We, therefore, affirm the judgment of the Appellate Court.

The following facts are set forth in the opinion of the Appellate Court. "The defendant, then twenty-three years old, and the complainant, then sixteen years old, began dating in January, 2001. Their relationship lasted until April 25, 2001. The complainant and the defendant presented very different versions of events that transpired immediately thereafter, which underlie this appeal.

"The complainant testified that she ended the relationship because the defendant was very possessive of her and did not permit her to do as she pleased. She testified that the defendant did not accept that the relationship was over. The complainant testified that during the late afternoon of April 29, 2001, the defendant called her at her home. She recalled that she was on another telephone line and, when she switched to answer the defendant's call, she overheard the defendant saying, apparently to someone else, 'I'm going to f'ing kill her.' The complainant hung up the telephone, and immediately thereafter, the defendant called her again and threatened to kill her. The complainant's friend, D, testified that she was with the complainant when the complainant received that call and that she overheard the defendant threaten to kill the complainant 'because he wanted to be with her and that if he couldn't be with her, nobody else could.' At trial, the complainant's mother testified that the complainant thereafter called her and told her that the defendant had threatened to kill the complainant.

"The complainant further related that on returning home from school the following afternoon, she encoun-

tered the defendant, who was waiting for her in a car parked near her home. The complainant testified that she refused to speak with him and that she went inside her home, went to her bedroom and picked up her telephone to call her mother. The complainant recalled that the defendant had followed her inside and was standing in her bedroom. The defendant hit the telephone from her hands, threw her onto her bed and crawled on top of her. The defendant produced a knife and held it close to her, screaming at her to the effect that if he could not be with her, nobody could. The defendant then stabbed the complainant in the chest, causing minor injury. As the defendant attempted to stab the complainant a second time, the complainant grabbed and bent the knife's blade, causing her to sustain cuts on her hands.

"The complainant further testified that after the defendant briefly 'calmed down,' he again threw her to the bed and stabbed her a second time, this time in her back, causing moderate injury. The complainant attempted to calm the defendant, and the defendant told her that they could either leave the scene together or that he was going to kill her. The complainant, motivated by a concern for her safety, agreed to leave with the defendant. The defendant led her to his car, holding a knife to her neck.

"The complainant testified that the defendant drove her to his apartment where his brother, Raphael Cortes, joined them. The defendant forced the complainant to sit in the backseat of the automobile with him while his brother drove. The defendant told the complainant that he was taking her to Lawrence, Massachusetts, to visit his aunts. On the drive to Lawrence, the complainant, at the defendant's instruction, called her mother on a cellular telephone, and told her that she loved the defendant, wanted to be with him and was going to New Hampshire with him. The complainant's mother

testified that she asked to speak to the defendant and told him that if he did not bring her daughter back, she was 'going to get him for kidnapping.' The complainant's mother further testified that the defendant told her that the complainant wanted to be with him.

"The complainant's mother testified that she thereafter called her boyfriend, Ron Nihill, a sergeant with the Connecticut state police. Nihill reported the matter to the state and local police. Luis Cruz, a friend of the defendant, later called the complainant's home and conveyed information to the complainant's mother and Nihill concerning the complainant's likely whereabouts in Lawrence, as well as information about the car that the defendant was using. Nihill relayed that information to police in Connecticut and Massachusetts.

"Michael Montecalvo, a police officer with the Lawrence police department, testified that, at approximately 8 p.m., he located the defendant's unoccupied car parked along a street in Lawrence. After driving around the area in which the car was parked, Montecalvo noticed that the car was being driven. Montecalvo followed the car and ultimately stopped it once detectives arrived to assist him. Montecalvo testified that the complainant was driving the car, with the defendant in the passenger seat. Montecalvo also testified that the complainant told him that she had been kidnapped and that he immediately observed wounds on her hands and back. Montecalvo called for medical assistance and later found a knife with a bent blade under the driver's seat of the car. The defendant's arrest followed.

"The defendant also testified and presented the testimony of twelve other witnesses. The defendant testified that he ended his relationship with the complainant because he lost interest in her, partly because she had lied to him about her age. The defendant testified that he knew that his relationship with the sixteen year old

complainant was wrong, that he learned that Nihill was a state police trooper and that he was 'very worried' that Nihill would find out about his relationship with the complainant. According to the defendant, the complainant was unable to accept that the relationship was over, and she cried and begged him not to end their relationship. The defendant testified that he went to the complainant's house on April 30, 2001, encountered the complainant when she got off of the school bus and asked her if he could take some of his clothing, which he had kept at her house. He testified that he went inside the house with the complainant, who was upset and kept asking him not to end the relationship. The defendant recalled that he waited in the living room for a short time before going upstairs to the complainant's bedroom. He found the complainant lying on her bed, crying and telling him not to leave her. When he turned toward the closet, the complainant approached him and began hitting and scratching him. She told him that she hated him. The defendant testified that the complainant then 'started to kick me in my oranges' and that he responded by pushing her away. The complainant fell back after tripping on a blanket, hitting her back on a nearby nightstand.

"The defendant further testified that the complainant thereafter armed herself with a piece of broken mirror glass, which she held to her chest. The complainant threatened to kill herself and told the defendant that she could not continue to live 'like this.' The defendant testified that he placed the complainant on the bed and pulled her hands apart to remove the glass from her grip. At that point, the complainant sustained cuts on the palms of her hands. The defendant tended to the complainant's wounds and apologized for pushing her. He testified that he began to feel 'scared' and 'responsible' for the complainant's distraught condition, and suggested that she accompany him to Lawrence to visit

his family. He told the complainant that he was going to live there and that during the summer, she could come and stay with him there.

"The defendant denied stabbing, restraining or abducting the complainant. He testified that he asked the complainant to accompany him to Massachusetts 'to calm her down and make her feel happy,' and that the complainant voluntarily accompanied him to Lawrence with his brother, who knew the directions to get there. The defendant explained that he took a kitchen knife from his apartment when he left the apartment and used it, as he commonly did, as a door key, to loosen and tighten screws on the apartment door's latching mechanism. The defendant recalled speaking with the complainant's mother during the trip to Lawrence, that the complainant's mother accused him of kidnapping her daughter and that he informed her that she should speak with her daughter about the trip, not him. The defendant testified that both he and the complainant visited with his friends and ate dinner at his aunt's house in Lawrence. The defendant testified that the complainant was in the act of voluntarily moving his car, which had been double-parked near a friend's house, when Montecalvo stopped him and the complainant." Id., 72–76.

The state charged the defendant with one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C), one count of unlawful restraint in the first degree in violation of § 53a-95 (a), and one count of assault in the second degree in violation of § 53a-60 (a) (2). Following a jury trial, at which the defendant was convicted of the latter two counts and acquitted of the former two counts, the court sentenced the defendant to a period of five years incarceration on each count, the

sentences to run consecutively. The defendant appealed from the trial court's judgment to the Appellate Court.

The defendant made two claims on appeal. Specifically, he claimed that "the court improperly excluded evidence of the sexual nature of the relationship between the complainant and himself";[2] id., 76; and that "the court violated his due process right to a fair trial by referring to the complainant as 'the victim' during its jury charge."[3] Id., 84. The Appellate Court agreed with both of the defendant's claims, reversed the trial court's judgment of conviction, and remanded the case for a new trial. Id., 87. This certified appeal followed. See footnote 1 of this opinion.

We begin with the state's claim that the Appellate Court improperly concluded that the trial court's incorrect exclusion of evidence of the sexual nature of the complainant's relationship with the defendant was not harmless error. The state contends that, because much of the evidence that already had been admitted alluded to the relationship's existence, the excluded evidence was merely cumulative. The defendant argues that the trial court's exclusion of evidence pertaining to his sexual relationship with the complainant was improper and violated his constitutional right to confront his accuser,

[2] The defendant sought to admit into evidence four letters the complainant wrote to him as well as several statements she allegedly had made to him on the day of the alleged abduction. See State v. Cortes, supra, 84 Conn. App. 77–80. The court admitted two of the letters, excluded one as hearsay, and excluded another because it alluded to the existence of a sexual relationship between the defendant and the complainant. Id., 78–79 and 79 n.5. The court also precluded the defendant from testifying that, on the day the incident transpired, the complainant had told the defendant that she was pregnant and said "that she could not 'believe' that he was '[moving to Massachusetts] after she gave it up to [him] . . . .' " Id., 79. Although the defendant argued that proffered evidence demonstrated the complainant's bias and state of mind, the court excluded it on the grounds that it impugned the complainant's character. Id., 79–80.

[3] The trial court referred to the complainant as the "victim" seventy-six times in its jury charge.

thus entitling him to a new trial. We agree with the defendant, but affirm on evidentiary grounds. Accordingly, because our conclusion mandates that the defendant be granted a new trial, we need not address the first certified question, namely, whether the trial court's jury charge constituted harmless error.[4] See footnote 1 of this opinion.

The following additional facts and procedural background relevant to this claim are set forth in the Appellate Court's opinion. "During cross-examination of the complainant's mother, the defendant attempted to elicit testimony concerning what she knew about the relationship between the complainant and the defendant. When the defendant's counsel inquired concerning whether the complainant's mother knew that the complainant and the defendant had engaged in a sexual relationship,

---

[4] Although the state concedes that the trial court's seventy-six references to the complainant as the "victim" in its jury charge were improper, it argues that such references constituted harmless error because the entire charge adequately conveyed that the complainant was merely *alleged* to be the victim of a crime. The state's contention is, at best, dubious. The trial court's seventy-six references to the complainant as the "victim" were neither isolated nor sporadic, but pervasive. The term "victim" commonly is understood to mean the person harmed by a crime or other injurious event. See American Heritage College Dictionary (4th Ed. 2002) (defining victim as "[o]ne who is harmed or killed by another"). In the context of the present case, the jury could have drawn only one inference from its repeated use, namely, that the defendant had committed a crime against the complainant. For this reason, we agree with those courts that have deemed references to the complainant as the "victim" inappropriate where the very commission of a crime is at issue. See *State* v. *R.B.*, 183 N.J. 308, 342–43, 873 A.2d 511 (2005) (violation of presumption of innocence for court to refer to complainant as "the victim" in jury charge); *People* v. *Davis*, 73 App. Div. 2d 693, 693–94, 423 N.Y.S.2d 229 (1979) (trial court's reference to complainant as "victim" and defendant as "perpetrator" constituted impermissible invasion of role of jury); *Talkington* v. *State*, 682 S.W.2d 674, 674–75 (Tex. App. 1984) (reference to alleged victim of sexual assault as "victim" in jury charge constituted reversible error when defendant raised consent as defense), review denied (January 10, 1985); but see *State* v. *Robinson*, 81 Conn. App. 26, 838 A.2d 243 (where defendant refused trial court's offer of curative instruction, trial court's thirteen references to complainant as "victim" did not merit reversal), cert. denied, 268 Conn. 921, 846 A.2d 882 (2004).

the prosecutor objected, and the court sustained the objection. The state thereafter filed a motion in limine seeking to preclude the defendant from offering any evidence concerning the complainant's sexual relationships absent 'an offer of proof that such evidence is admissible and that the probative value outweighs its prejudicial effect.'

"The court heard argument on the state's motion. The defendant argued that the evidence was relevant to the emotional mindset of the complainant and the defendant as well as to the status of their relationship before the incident. Further, the defendant argued that the evidence was relevant to discrediting the testimony of the complainant's mother, who had testified that the complainant and the defendant had not spent 'the night together.' The court ruled that the defendant could seek to introduce any such evidence outside of the jury's presence and that the court would determine, at such time, whether the probative value of such evidence outweighed its prejudicial effect.

"On the next day of trial, the defendant gave notice of his intention to question witnesses concerning sexual relationships between (1) the complainant and the defendant, (2) the complainant and the defendant's brother, and (3) the defendant and the complainant's friend, D. The defendant represented that evidence of a sexual relationship between himself and the complainant was relevant to the emotional state and motives of the parties, to show the 'intensity of feelings' between the parties. The defendant also sought to introduce that evidence to discredit the testimony of the complainant's mother. The defendant argued that evidence of a sexual relationship between him and D, a prosecution witness, was probative of D's alleged bias and probative because it made it likely that D would have 'tough feelings' concerning the defendant. Finally, the defendant argued that evidence of a sexual relationship between the com-

plainant and his brother was relevant to undermining the complainant's version of events and, specifically, her testimony that the defendant had forced her to accompany him and that she was unable to seek help during the drive to Lawrence.

"The court granted the state's motion, precluding evidence of the sexual relationships that the defense sought to introduce as evidence. The court stated that 'relationships are an appropriate area of inquiry between people when they testify because it may go to the issue of motive, bias, prejudice, which is also appropriate for examination.' The court, however, explained that sexual relationships were different and implicated other concerns. The court explained to the defendant's attorney: 'You are correct when you say that this is not a sexual assault case, but I think the court can take direction from what our legislature has established when it enacted the rape shield law, which, as you know, involves a sexual assault case and the limited, the very limited disclosure of sexual contact between the accused in a sexual assault case and the victim, the limited disclosure that can only come in as to a certain specific issue, consent.' The court reasoned that because the legislature had so limited the admissibility of evidence of sexual contact in sexual assault cases, such evidence was 'even less relevant' in a case that did not concern sexual assault.

"The defendant thereafter sought to introduce four letters written to him by the complainant as evidence of her state of mind toward him shortly before April 30, 2001. The court excluded one of the letters partially on the ground that the subject matter of the letter concerned the sexual relationship between the complainant and the defendant.[5] [It excluded another on hearsay grounds.]

---

[5] "The letter [defendant's exhibit S for identification], dated April 11, 2001, stated in relevant part: 'Hi Sweetie! What's up? I am really happy that you moved home. I am going to ask my mom if I can sleep over tomorrow night.

"The defendant's attorney also made an offer of proof, through the defendant, concerning the defendant's relationship with the complainant. The defendant testified that when he was in the complainant's bedroom on April 30, 2001, the complainant was upset with him because he told her that he was going to leave Connecticut to live in Massachusetts. The defendant testified that the complainant was crying and told him that she could not 'believe' that he was 'doing this after she gave it up to [the defendant] . . . .' The complainant told him that she did not want him to leave. The defendant also testified that the complainant then told him something that 'scared him,' that she was pregnant. The defendant further testified that he offered to take the complainant to Lawrence with him because he did not want the complainant's mother or [her mother's boyfriend] Nihill to 'get involved' and that, feeling responsible, he 'came up with a solution to make [the complainant] happy . . . .' The defendant offered that evidence to show the effect of the complainant's remarks on him, as well as to demonstrate the complainant's state of mind and alleged bias toward him. The state argued that the court should exclude the evidence because it would 'smear' the complainant and 'impugn' her character, and the state objected because the nature and circumstances of the relationship and the statements made by the complainant were not relevant.

"The court disallowed the proffered evidence. The court stated: 'The specific acts that are claimed to be offered as it relates to sexual intercourse are not appropriate in this setting. . . . [R]eference is made to my citing of the rape shield law and its relevance on a

I wish that I could spend every minute of every day with you. I love you so much. I wanna spend the rest of my life with you. I can not wait for the day I say "I do!" I also can not wait until we get to live together. Well baby, I gotta go because the bell is gunna ring any minute. I love you! 4-life!' "
*State* v. *Cortes*, supra, 84 Conn. App. 79 n.6.

sexual assault case. This is not a sexual assault case. If you're going to the state of mind of the victim, obviously, I've given you thus far . . . and I don't think you can take umbrage with that, sufficient leeway to establish the basis of the relationship, the involvement of the relationship. You can get into areas that she was upset about the breakup, things of that sort, but the court feels that those two areas, give it up for him and that she was pregnant, go beyond the bounds of what the court feels is appropriate in this case, feels that it is prejudicial, also feels that it's being offered for additional information other than for state of mind for the truth, and that is hearsay and it also is prejudicial, and the court feels that it's not appropriate.' " *State* v. *Cortes*, supra, 84 Conn. App. 77–80.

Although the Appellate Court concluded that the trial court's ruling prohibiting inquiry into the sexual relationship between the complainant and the defendant was improper because it violated the defendant's sixth amendment right to confront his accusers;[6] id., 83; we must be mindful that "[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986). Accordingly, we agree with the result reached by the Appellate Court, but for different reasons. Rather, we conclude that the trial court abused its discretion by granting the state's motion in limine and excluding from evidence the nature of the complainant's relationship with the defendant. We further conclude that this improper evidentiary ruling was not harmless error.

"Our analysis of the defendant's evidentiary claims is based on well established principles of law. The trial

---

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 180, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Furthermore, in order to prevail, the party seeking reversal must demonstrate that the evidentiary error was harmful, that is, that it likely affected the outcome at trial. *State* v. *Valentine*, 240 Conn. 395, 404, 692 A.2d 727 (1997). Despite this deferential standard, the trial court's discretion is not absolute. Provided the defendant demonstrates that substantial prejudice or injustice resulted, evidentiary rulings will be overturned on appeal where the record reveals that the trial court could not reasonably conclude as it did. *State* v. *Colon*, supra, 180.

Relevant evidence, that is, "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence"; (internal quotation marks omitted) Conn. Code Evid. § 4-1; generally is admissible; Conn. Code Evid. § 4-2; unless "its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3.

The trial court, taking guidance from the rape shield statute, General Statutes § 54-86f,[7] deemed irrelevant

[7] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible

evidence of the sexual relationship between the defendant and the complainant, stating: "We are now involved in a case that is not sexual assault, so the relevance . . . of the sexual activity between these individuals becomes somewhat diminished because, obviously, if the legislature felt it was limitedly relevant in a sexual assault case, the court takes direction that it's even less relevant when we're dealing with a nonsexual assault case." It, therefore, limited the defendant to demonstrating the existence of a relationship between the various individuals, with no evidence of any sexual activity.

"[E]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, i]t may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996). Accordingly, "[c]ross-examination to elicit facts which tend to show motive, interest, bias or prejudice is a matter of right, and although the extent of such cross-examination may often rest in the sound discretion of the court, a denial of the right, or its undue restriction, will constitute reversible error." *State* v. *Luzzi*, 147 Conn. 40, 46, 156 A.2d 505 (1959). Although trial courts are vested with broad authority to limit the scope of cross-examination, they must be mindful that it remains the best vehicle for discovering the truth and is to be vigilantly guarded. Id., 46–47. Despite the fact that the trial court acknowledged that a sexual relationship differs from a nonsexual one, it nevertheless concluded that the defendant would be

---

unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ."

able to elicit potential bias sufficiently without delving into the individuals' sexual affairs.

In the present case, the most effective method of impeaching the state's witnesses was to illustrate their bias through evidence of the individuals' sexual relationships. The termination of an emotionally charged sexual relationship unquestionably generates greater bias and motive to fabricate accusations than an argument between friends or acquaintances. Here, among the most valuable evidence of bias were the defendant's statements that the complainant became hysterical, stated that she could not believe the defendant would leave her after she "gave it up to [the defendant]" and falsely told him that she was pregnant. These statements provide substantial insight into the extent of the complainant's anger at the defendant, and we are persuaded that their improper exclusion, together with the other evidence of their sexual relationship, caused the defendant substantial injustice and likely affected the outcome at trial by significantly compromising his ability to impeach his accuser's credibility in a case that essentially turned on the jury's crediting her version of the events over his. Furthermore, the trial court's reliance on the rape shield statute was misplaced because the application of § 54-86f is confined to sexual assault crimes. See footnote 7 of this opinion.

The state argues that the trial court did not abuse its discretion because the relevance of the sexual relationship evidence "was slight and inconsequential because there was ample evidence to support the inference that the relationship was sexual in nature and, in any event, the question whether the relationship was sexual in nature had little bearing on any material issue in the case." We are not persuaded. As stated previously, a sexual relationship differs substantially from a nonsexual one in the level of emotional intensity and potential animus resulting from its termination. The allusions to

the existence of a sexual relationship made by witnesses and contained in letters such as defense exhibit Q[8] were mild and did not hint at the level of bias suggested by the excluded statements, which included a false allegation that the complainant was pregnant with the defendant's child.

Therefore, because evidence of the sexual relationship between the defendant and the complainant was neither irrelevant nor unfairly prejudicial, and because its exclusion caused the defendant substantial injustice and likely affected the outcome at trial, the trial court's improper granting of the state's motion in limine requires that the defendant receive a new trial.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[8] Defense exhibit Q provides in relevant part: "I would do anything for you. When I say anything . . . I mean anything," and "What do you want to do on Saturday when I stay over?"