STATE OF CONNECTICUT *v.* IGNACIO VILCHEL
(AC 27000)

DiPentima, Harper and Lavery, Js.

---

Argued September 10, 2008—officially released February 3, 2009

*Darcy McGraw*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John F. Fahey*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Ignacio Vilchel, was convicted, after a jury trial, of attempt to assault a peace officer in violation of General Statutes §§ 53a-167c (a) (1) and 53a-49 (a) (2), attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-49 (a) (2), and conspiracy to sell narcotics in violation of General Statutes §§ 21a-278 (b) and 53a-48 (a).[1] The defendant raises claims related to the assault charges; he claims that the trial court deprived him of his due process right to a fair trial by (1) failing to instruct the jury to consider whether his conduct was justified in light of illegal conduct by the police, (2)

[1] The court sentenced the defendant to a total effective term of imprisonment of thirty-five years, suspended after twenty years, followed by five years of probation. The court enhanced the defendant's sentence pursuant to General Statutes § 53-202k. The jury delivered a verdict of not guilty with regard to an additional count of the state's information that alleged that the defendant sold narcotics in violation of General Statutes § 21a-278 (b).

failing to instruct the jury concerning the defense of renunciation and (3) referring to the police as victims during its charge. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On March 20, 2003, Hartford police detectives were conducting undercover surveillance at an address on Norwich Street on information that unlawful drug transactions were occurring at that place. The detectives were dressed in civilian clothing, with their police badges worn outside of their clothing on chains around their necks. During their surveillance, the detectives observed Josue Rodriguez engage in the hand-to-hand sale of narcotics. After the detectives apprehended Rodriguez, they discovered forty-two bags of heroin and crack cocaine in his possession.

Following his arrest, Rodriguez cooperated with the police by arranging to purchase twenty grams of heroin from his drug supplier. Using his cellular telephone, with the telephone's speaker turned on so that the conversation was audible to the police, Rodriguez called another individual who agreed to meet Rodriguez in fifteen minutes at an address on Francis Avenue.

Meanwhile, the defendant was at his apartment on South Whitney Street. Also present were Cecilio Casado, Roberto Morales and the defendant's wife, Elizabeth Casado. Rodriguez' telephone call was answered by Morales, who, upon announcing the purpose of the call, obtained a quantity of heroin from the defendant. Morales left the apartment alone and, in a minivan registered to Elizabeth Casado, drove to the Francis Avenue address specified by Rodriguez. Rodriguez, accompanied by police detectives, was present at the address when Morales arrived. After Rodriguez spoke with Morales, verifying that Morales possessed narcotics, the

detectives approached Morales and identified themselves. Morales attempted either to swallow or to conceal in his mouth a bag containing 19.63 grams of pure heroin, but the detectives compelled him to expel the heroin from his mouth.

Following this incident, Rodriguez, at the request of the detectives, called his drug supplier a second time. Once again, Rodriguez used his cellular telephone with its speaker turned on so that detectives could overhear the entire conversation. Rodriguez spoke with an individual and reported that nobody had delivered the narcotics to the Francis Avenue address as had been arranged. The individual on the other end of the conversation agreed to meet Rodriguez at that address. Shortly thereafter, the defendant arrived at the Francis Avenue address driving a tow truck registered in his name. Cecilio Casado, a passenger, exited the truck and walked to the minivan that Morales had driven there earlier. The defendant, using his cellular telephone, called Rodriguez and asked him where he was. Rodriguez replied that he had left the location because Morales failed to meet him there. Thereafter, the defendant and Cecilio Casado left the scene in the tow truck.

The detectives followed the truck for some distance, ultimately proceeding to the defendant's residence on South Whitney Street, which was known to the police as a location where narcotics were sold. The detectives arrived at the address as the defendant and Cecilio Casado were returning. On foot, Detectives Ramon Baez and Curtis Lollar followed the men as they approached the front door of the residence. From a distance of approximately ten feet, Baez and Lollar identified themselves as police officers, displayed their police badges and asked the men to stop. The defendant and Cecilio Casado looked at the detectives who were pursuing them and quickly entered the residence to avoid apprehension. They closed the door behind them and

attempted to hold the door closed, but Baez and Lollar ultimately gained entry to the residence through the door.

Upon entering the residence, Baez observed the defendant and Cecilio Casado running down a hallway. Baez pursued the defendant into a bedroom located off the hallway. Lollar pursued and apprehended Cecilio Casado in a different part of the residence. Following the defendant, Baez, still wearing his police badge, entered the bedroom while brandishing a pistol. There, the defendant approached Baez while attempting to insert an ammunition clip into a pistol that he was pointing at him. In response, Baez yelled "gun," and retreated into the hallway. From this position approximately eight feet from the defendant, Baez commanded, "police, drop the gun, drop the gun." The defendant did not comply but advanced toward Baez, pointing his pistol at him while attempting to load the ammunition clip. Fearing for his safety, Baez fired three gunshots at the defendant. As a result of the gunshots, the defendant dropped his pistol and sustained injuries for which he received medical care. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court improperly failed to instruct the jury to consider whether his conduct was justified in light of illegal conduct by the police. The defendant asserts that the police entry into his residence was illegal and that by reasonably defending himself, he exercised his right to resist this intrusion. Likewise, the defendant claims that the court's instruction concerning § 53a-167c (a) (1) was inadequate because the court did not specifically instruct the jury to determine whether the police officers had acted illegally and whether, given such police

illegality, the police were acting in the performance of their duties at the time the assault allegedly occurred.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Heinemann*, 282 Conn. 281, 300, 920 A.2d 278 (2007).

To the extent that the defendant claims that the court should have instructed the jury concerning his limited right to resist the police entry into his home, a right that will be discussed in further detail, the claim is preserved for our review. The defendant requested an instruction of this nature in a written request to charge.

To the extent that the defendant otherwise claims that the court did not adequately instruct the jury with regard to his privilege to resist illegal police conduct, the claim is not preserved. The defendant recognizes that his trial counsel "may not have been particularly eloquent" in raising these issues at trial and, to the extent that these interrelated claims are not preserved, requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Essentially, the defendant claims that the court deprived him of his right to present a defense and inadequately instructed the jury with regard to one of the essential elements of a crime with which he stood charged. These claims are both reviewable and constitutional in nature.

It is well settled that an improper jury instruction concerning an essential element of a crime may deprive a defendant of his due process right to a fair trial. See *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995). Additionally, "[a] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . We have said that a defendant is entitled to have the court present instructions to the jury relating to any theory of the defense for which there is any foundation in the evidence, even if weak or incredible. . . . We must consider the evidence presented at trial in the light most favorable to supporting the defendant's request to charge. . . . An instruction on a legally recognized theory of defense, however, is warranted only if the evidence indicates the availability of that defense. . . . The trial court should not submit an issue to the jury that is unsupported by the facts in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993).

As a preliminary matter, we must explore the legal principles related to the defendant's common-law privilege to resist certain types of police conduct on which

the defendant bases this claim. In *State* v. *Gallagher*, 191 Conn. 433, 442, 465 A.2d 323 (1983), overruled in part on other grounds by *State* v. *Brocuglio*, 264 Conn. 778, 786, 826 A.2d 145 (2003), our Supreme Court confirmed the existence of a limited common-law privilege reasonably to resist an unlawful, warrantless entry by the police into one's home. The court stated: "[T]here are circumstances where unlawful warrantless intrusion into the home creates a privilege to resist, and that punishment of such resistance is therefore improper." Id. The court recognized that the privilege encompasses reasonable resistance, but not resistance "rising to the level of an assault . . . ." Id., 443.[2] The defendants in *Gallagher* were charged with interfering with an officer in connection with an incident in which a police officer entered the defendants' home without a warrant and arrested them. Id., 435–36. The Supreme Court observed that at trial, the defendants requested that the court instruct the jury that the unlawfulness of the officer's

[2] In *State* v. *Brocuglio*, 264 Conn. 778, 793–94, 826 A.2d 145 (2003), our Supreme Court held that "the common-law privilege to challenge an unlawful entry into one's home still exists *to the extent that a person's conduct does not rise to the level of a crime*." (Emphasis added.) The court overruled *Gallagher* "only to the extent that it conflicts with [the court's] adoption of the new crime exception." Id., 786. The court also held that because the new crime exception had the effect of criminalizing conduct that had been sanctioned by the common law, the new crime exception did not apply retroactively. Id., 796.

The defendant also claims that § 53a-167c is unconstitutionally vague as applied to him. Although the rationale of this claim is difficult to follow, the defendant appears to argue that the new crime exception recognized in *Brocuglio* unconstitutionally expanded the conduct to which § 53a-167c may be applied and that such judicial action unfairly limited the defenses available to him. The defendant did not raise this claim before the court, and, thus, the court did not rule on it. The defendant does not request any type of extraordinary review of this unpreserved claim, and, as this court does not engage in a level of review that is not requested; see *State* v. *Diaz*, 109 Conn. App. 519, 539 n.7, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008); we decline to review the claim. Nevertheless, even if the claim were reviewable, we would easily reject it because we have already observed that *Brocuglio* had no retroactive application to the facts of this case.

entry constituted a defense to the charge. Id., 439. The Supreme Court observed that the trial court had not instructed the jury to consider the common-law privilege to resist an unlawful entry into the home but had instructed the jury in accordance with General Statutes § 53a-23.[3] *State* v. *Gallagher*, supra, 440. The court reversed the judgment of conviction after concluding that the defendants had presented a version of the facts that fell within the common-law privilege to resist an illegal entry, that there existed an issue of fact as to whether the conduct underlying the charge fell within this privilege and that the trial court improperly failed "to instruct the jury concerning the defense of reasonable resistance to an unlawful entry." Id., 445.

The defendant in *State* v. *Davis*, 261 Conn. 553, 555–56, 804 A.2d 781 (2002), was convicted of assault of a peace officer and interfering with a peace officer in connection with an incident that occurred on a public street corner. The state presented evidence that the defendant ignored a police officer's command to leave the corner and later physically resisted the police officer's efforts to arrest him for disorderly conduct. Id., 556–57. The defendant presented evidence that during the incident, although he had complied with the commands of the police officer, he physically was assaulted by police officers independent of any arrest and that he physically resisted this unprovoked police conduct. Id., 558–59.

As part of its jury instructions, the court delivered an instruction concerning § 53a-23. Id., 561. The defendant claimed that this instruction violated his right to due process because it relieved the state of its duty to prove all of the elements of the crimes with which he stood

[3] General Statutes § 53a-23 provides in relevant part: "A person is not justified in using physical force to resist an arrest by a reasonably identifiable peace officer . . . whether such arrest is legal or illegal."

charged. Id. "Specifically, the defendant claime[d] that the trial court's instruction pertaining to § 53a-23 misled the jury to believe that the defendant could not resist a peace officer to defend himself, no matter how unlawful the conduct of the police officer was . . . ." Id. Our Supreme Court recognized that § 53a-23 abrogated the common-law privilege to resist illegal arrests, *but not the common-law privilege to resist other types of illegal police conduct.* Id., 567. The court explained: "[Section] 53a-23 was intended to require an arrestee to submit to an *arrest*, even though he believes, and may ultimately establish, that the arrest was without probable cause or was otherwise unlawful. It was not intended to require an arrestee to submit to egregiously unlawful conduct—such as an unprovoked assault—by the police in the course of an arrest, whether the arrest was legal or illegal. . . . A fortiori, § 53a-23 was not intended to require the defendant to submit to unlawful police conduct when there has been no attempted arrest." (Citations omitted; emphasis in original.) Id., 568.

The Supreme Court concluded that the trial court's jury instructions were deficient. Id., 569–71. The court stated: "The defendant's theory of defense in this case was that (1) there had been no attempted arrest and (2) the force used by the police officers was excessive even if it was assumed that there had been an arrest. Under these circumstances, the trial court's failure to provide detailed instructions on the meaning of the phrase 'performance of their duties,' and to explain that the use of unwarranted or excessive force is not within the performance of duties for purposes of [General Statutes] § 53a-167a or § 53a-167c virtually eliminated that element of those offenses from the jury's consideration, in violation of the defendant's due process rights." *State* v. *Davis,* supra, 261 Conn. 571. Additionally, the court stated: "[A] defendant charged with violating . . .

§ 53a-167c (a) is not entitled to a self-defense instruction. In effect, a detailed instruction that the state must establish that the police officer had been acting in the performance of his duty and that a person is not required to submit to the unlawful use of physical force during the course of an arrest, whether the arrest itself is legal or illegal, stands in lieu of a self-defense instruction in such cases. Consequently, the failure to provide such instructions when the defendant has presented evidence, no matter how weak or incredible, that the police officer was not acting in the performance of his duty, effectively operates to deprive a defendant of his due process right to present a defense." Id. The court emphasized that the issue of whether the use of force by the police officers was justified, such that it was within the performance of their police duties, was a factual issue to be determined by the jury. Id., 572.

In reaching its decision in *Davis*, our Supreme Court looked favorably on this court's analysis and holding in *State* v. *Privitera*, 1 Conn. App. 709, 476 A.2d 605 (1984). In *Privitera*, the defendant was convicted of interfering with a police officer. Id., 710. As is the case in a prosecution for assault of a peace officer, in a prosecution for interfering with a police officer, the state must establish that the police officer at issue was acting in the performance of his official duties. Id., 722. In *Privitera*, the defendant presented evidence that during the incident underlying the conviction, he was compliant with the commands of the police officers, that he was struck by the officers without provocation and that he kicked one of the officers in self-defense. Id., 711. This court concluded that the trial court's instructions were inadequate insofar as they related to the issue of whether the officers were acting in the performance of their duties. Id., 723. The court explained: "Whether [an officer] is acting in the performance of his duty . . . must be determined in the light

of that purpose and duty. If he is acting under a good faith belief that he is carrying out that duty, and if his actions are reasonably designed to that end, he is acting in the performance of his duties. . . . Although from time to time a police officer may have a duty to make an arrest, his duties are not coextensive with his power to arrest. [His] official duties may cover many functions which have nothing whatever to do with making arrests. . . . The phrase in the performance of his official duties means that the police officer is simply acting within the scope of what [he] is employed to do. The test is whether the [police officer] is acting within that compass or is engaging in a personal frolic of his own. . . . These are factual questions for the jury to determine on the basis of all the circumstances of the case and under appropriate instructions from the court." (Citations omitted; internal quotation marks omitted.) Id., 722.

In *State* v. *Casanova*, 255 Conn. 581, 593–94, 767 A.2d 1189 (2001), our Supreme Court held that the analysis in *Privitera*, concerning interfering with a police officer in violation of § 53a-167a (a), applied to a defendant's conviction for assaulting a peace officer in violation of § 53a-167c. The defendant in *Casanova* claimed that the trial court improperly had excluded evidence that the police officers had been engaged in a personal frolic and were not acting in the performance of their duties at the time of the incident underlying his conviction. Id., 590–91. The state presented evidence that the police officers entered the defendant's residence to arrest a family member of the defendant and that the defendant assaulted a police officer during that incident. Id., 583–85. Our Supreme Court agreed with the defendant that in excluding evidence relating to the circumstances surrounding and the motivation of the police entering his home, the trial court deprived him of the opportunity to demonstrate that the police had not been acting in

the performance of their duties and that such ruling constituted reversible error. Id., 594, 596.

The defendant relies on those precedents, which relate to his common-law privileges to resist certain types of police conduct and describe, in relevant part, what the state must prove to sustain a conviction for assault of a peace officer. He claims that the court's instructions were deficient in that they did not fully guide the jury to a proper analysis of the illegal conduct of the police officers who entered his residence. He argues that the court's failure to instruct the jury to consider whether he was exercising his common-law privilege to resist illegal police conduct and to instruct the jury, in greater detail, with regard to the statutory requirement that the police must be acting in the performance of their duties, deprived him of his right to a fair trial.

With regard to the assault of a peace officer count, the court instructed the jury in relevant part: "Assault of a public safety personnel, § 53a-167c, provides as follows: A person is guilty of assault of a public safety personnel when, with an intent to prevent a reasonably identified peace officer from performing his or [her] duties, and while such peace officer is acting in the performance of his or her duties, such person caused physical injury to such peace officer. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: that the victim of the assault was a reasonably identifiable peace officer. Two, that the conduct of the defendant occurred while the peace officer was acting in the performance of his or her duties. Three, that the defendant had the specific intent to prevent the peace officer from performing his or her lawful duties, and . . . four, that the defendant caused physical injury to the peace officer.

"Peace officer means a member of an organized local police, and in determining whether an individual is a reasonably identified peace officer, the standard you are to apply as jurors is whether a reasonable person, under the same circumstances, should have identified the other person as a peace officer. In ruling on this standard, such facts as whether the other person wore a uniform, whether he identified himself or showed his badge, or other identification, or the manner in which he acted and conducted himself are all relevant to your decision of whether that person was reasonably identifiable as a peace officer. If you so find, it is . . . irrelevant whether the peace officer was officially on duty at the time of the attempted arrest . . . as long as he was an identifiable peace officer.

"To prove § 53a-167c, the state must establish that the peace officer was acting in the performance of his official duties. Whether a peace officer was acting in the performance of his duties, within the meaning of § 53a-167c, must be determined in a light of that purpose and duty.

"If he is acting on a good faith belief that he is carrying out that duty, and if his actions are reasonably designed to that end, he is acting in the performance of his duties. Although from time to time a police officer may have a duty to make an arrest, his duties are not coextensive with his powers to arrest. A peace officer's official duties may cover many functions which have nothing [to do] with making arrests. The phrase 'in performance of his official duties' means that a peace officer is simply acting within the scope of what he is employed to do. The test is whether the peace officer is acting within the compass or is engaging in a personal frolic of his own. I have already charged you on intent, and refer to that definition above." Following these instructions, the court delivered instructions to the jury concerning

the defense of mistake of fact.[4] The court instructed the jury that the mistake of fact defense applied only to this count of the information.

With regard to the assault in the first degree count, the court instructed the jury in relevant part: "I will define assault in the first degree for you, and you are to combine this definition with the definition of attempt I gave you above. Once again, they must be read together for your evaluation. Once again, it is not necessary for the state to show the defendant completed the crime, but the state must prove that the defendant met all the elements of attempt in order for you to find the defendant guilty of this charge.

"I am giving you the elements of the underlying crime of assault on a public safety personnel in order for you to determine whether the defendant had the requisite intent. Section 53a-59 (a) (5), assault by means of a discharge of a firearm, provides as follows: A person is guilty of assault in the first degree when, with intent to cause physical injury to another person, he causes

---

[4] The court instructed the jury in relevant part as follows: "The defense of mistake of fact is available under General Statutes § 53a-6 (a), which provides in relevant part: A person shall not be relieved of criminal liability for conduct because he engages in such conduct under mistaken belief or fact unless such factual mistake negates the mental state required for the commission of an offense.

"I remind you that the state bears the burden of proving all of the elements of a crime beyond a reasonable doubt, including specific intent, as required here. In this case, the defendant claims that he was mistaken as to the fact that the individuals who entered his home on the night in question were peace officers. If you find that the defendant was so mistaken, and you find the state has otherwise failed to prove that the defendant had the specific intent to prevent the peace officers from performing [their] lawful duties, then you must find the defendant not guilty of this charge.

"[T]his defense only applies to count one and should not be considered with any other count. Okay? If you find that the state has proven beyond a reasonable doubt each of the elements of the crime of attempted assault on a public safety personnel, then you shall find the defendant guilty. On the other hand, if you find the state has failed to prove beyond a reasonable doubt any of the elements, you shall find the defendant not guilty."

such injury to such person or to a third person by means of discharge of a firearm.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. One, that the defendant intended to cause physical injury to another person. Two, that the defendant caused physical injury to that person or a third person. And three, he caused that injury by means of discharge of a firearm. Physical injury is defined as impairment of a physical condition or pain.

"The state must prove beyond a reasonable doubt that the defendant intended to cause physical injury to another person, and what the defendant intended is a question of fact for you to determine. . . .

"The next element that . . . the state must prove beyond a reasonable doubt is that acting with that intent, the defendant attempted to cause physical injury to another person. It does not matter whether the victim was the person upon whom the defendant intended to inflict the physical injury. If, in fact, you find such an intent, it is sufficient if you find the defendant intended to cause physical injury to another person, that he, in fact, attempted to cause physical injury to that person or some other person.

"The next element the state must prove beyond a reasonable doubt is that the defendant attempted to cause physical injury by means of discharge of a firearm. A firearm is defined by statute as any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded, from which a shot may be discharged." With regard to this count only, the court instructed the jury with regard to the defense of justification.[5]

---

[5] The court instructed the jury in relevant part as follows: "Self-defense is a means by which the law justifies the use of force that would otherwise be illegal. Once self-defense is raised in a case, the state must [disprove] the defense beyond a reasonable doubt. A person is justified in the use of reasonable physical force upon another when he reasonably believes that

such force is necessary to protect himself from the use or imminent use of force.

"Self-defense is a legal defense to the use of force that would otherwise be criminal. I'll now define that term to you in a legal sense. You are to follow this instruction in reviewing the evidence in this case and not apply any common or colloquial meaning to the term that you may have heard before. . . .

"[General Statutes § 53a-19 (a)] provides as follows: A person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to [be] the imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose, except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use deadly physical force or inflicting or about to inflict great bodily harm.

"In this case, we are talking about the use of deadly physical force by the defendant. It is therefore the last portion of that section of the statute on self-defense that is implicated in this case . . . ." The court thereafter defined the terms "deadly physical force," "serious physical injury," "great bodily harm," "using" and "about to use," as used in the self-defense statute.

The court continued: "[T]he defendant does not have to prove that he acted in self-defense, but if self-defense is raised in a case, and it has been raised in this case, then it is [the] state's burden to disprove the defense beyond a reasonable doubt. The statute focuses on the person claiming self-defense. It focuses on what he reasonably believed under the circumstances and presents a question of fact for the jury. In other words, what is important is what the defendant reasonably believed under the circumstances in this case. You must also consider, however, whether what the defendant, in fact, believed, was objectively reasonable under the circumstances. Thus, you must first determine whether the defendant believed that an attack was imminent, and then you must determine whether the belief was reasonable.

"Similarly, you must determine whether the degree of force used was reasonable. The test for the degree of force in self-defense is a subjective-objective test . . . . Self-defense thus requires the jury to measure the justifiability of the defendant's actions from a subjective perspective, meaning his. That is, what the defendant reasonably believed under the circumstances presented in this case and on the basis of what the defendant perceived the circumstances to be. Section 53a-19 (a) requires, however, that the defendant's belief must have been reasonable and not irrational or unreasonable under the circumstances. That is, would a reasonable person in the defendant's circumstances have reached that belief?

"That is the objective aspect of the test. It is both the question of what his belief was and whether it was reasonable. In this case, if you find proven beyond a reasonable doubt that the victim was not using or about to use deadly physical force or inflict great bodily harm upon the defendant, and if you further find proven beyond a reasonable doubt that the defendant has no reasonable belief that the victim was using or about to use deadly physical force or about to inflict great bodily harm upon the defendant,

At trial, the defendant presented evidence, including his testimony, that on the night in question he was at home with Elizabeth Casado, Cecilio Casado, Morales and his two young children.[6] At approximately 9:30 p.m., Morales, an automobile mechanic, left the defendant's residence in Elizabeth Casado's minivan to retrieve some tools and to tend to an automobile belonging to one of his customers. Approximately one hour later, the defendant drove himself and Cecilio Casado to a garage on Francis Street, where they were to meet Morales. The defendant was unaware of any drug related activity at this location.

The defendant arrived at the Francis Avenue address, but neither he nor Cecilio Casado encountered Morales in or about the minivan that was parked there. Thereafter, the defendant drove Cecilio Casado back to the defendant's residence on South Whitney Street. Upon entering his residence with Cecilio Casado, two men followed him and pushed their way into the residence through the front door. The defendant instructed Elizabeth Casado to hide the children under a bed and to call the police.[7] Meanwhile, the defendant went into the

then the defendant would not be justified in using deadly physical force upon the victim. You would, under those circumstances, reject the defense of self-defense. [T]he burden remains on the state to disprove the defense of self-defense beyond a reasonable doubt.

"Exceptions: Officer is a reasonably identified peace officer acting within the scope of his duties. You must find that the use of physical force was not justified if the state proves beyond a reasonable doubt that the officer was a reasonably identified officer acting within the scope of his duties as I have defined for you above.

"In summary, you have heard all the evidence in this case. With reference to the defendant's claims of self-defense, the state must disprove this defense beyond a reasonable doubt. If it has not, you must find the defendant not guilty."

[6] The defendant presented evidence that as a result of a medical condition, a portion of one of his feet had been amputated prior to the events underlying this appeal.

[7] The defendant presented evidence that Elizabeth Casado ultimately called 911, reporting that gunshots had been fired.

dining room where he retrieved a pistol. He attempted to insert an ammunition clip into the pistol and held the pistol extended as he entered a hallway. He observed two men enter the residence and heard them identify themselves as the police. The defendant, aware of accounts of criminals who impersonated police officers to gain entry into homes, was unsure if these men were, in fact, police officers. Nevertheless, as he was about to lower his pistol, one of the men shot him.

It is the state's contention that the defendant was not entitled to instructions concerning his common-law privilege to resist certain types of police conduct because, during the course of the trial, the defendant did not assert that the police officers were engaged in unlawful conduct, were using unreasonable force or were not acting in the performance of their duties when they entered his residence. The state argues that the defendant, instead, based his defense on the theory that he misidentified Baez and Lollar, mistakenly believing that they were criminal intruders, and that he acted reasonably in self-defense on the basis of this mistake of fact. Consequently, the state posits that the court's instruction concerning § 53a-167c was sufficient because the defendant did not claim that the police were not acting in the performance of their duties or were acting unlawfully when they entered the defendant's residence. On the basis of the representations of the defendant's attorney during trial concerning the issues raised by the defense, the state posits that the defendant waived his right to challenge the court's instructions in the manner claimed.

We have carefully reviewed the transcript of the underlying proceedings. It suffices to observe that at several points during the trial, the court and the parties discussed the parties' view of the issues in the case and the appropriate jury instructions. Early during the trial, the defendant submitted a written request to charge

that included a *Gallagher* instruction concerning his privilege reasonably to resist an unlawful entry into his home by a police officer. Nevertheless, several representations made by the defendant's attorney during the trial plainly reflect that the defendant did not seek to establish that the police officers were engaged in unlawful conduct, were using unreasonable force or were not acting in the performance of their duties when they entered the residence.

By way of example, during the defendant's cross-examination of Baez, the defendant's attorney inquired concerning the events leading to and including the officers' entry into the defendant's residence. The defendant's attorney asked Baez whether he believed he was justified in entering the residence. Following an objection by the state, the court asked the defendant's attorney whether he claimed the inquiry. The defendant's attorney stated: "This isn't worth pursuing. It's just basic background information. I'm not claiming any illegal search or anything of that nature . . . . I don't think it's important." The court asked if the defendant was "going anywhere" with the issue of whether the police had acted legally. The defendant's attorney replied: "No. No. No, I'm not. That's why I don't think it's that important. I'm just giving basic background information here." Thereafter, the court instructed the jury to disregard the question posed by the defendant's attorney.

During closing argument, the defendant's attorney emphasized that the defense was not claiming that the police had acted improperly or outside of the scope of their police duties. The defendant's attorney stated: "I'm not going to stand here and tell you that you should conclude, or that the evidence shows, that Detective Baez acted unreasonably or irresponsibly when he shot the defendant. You're not going to hear that from me. . . . [Y]ou're not here to judge Detective Baez' actions. You're here to examine what the defendant did and

why, what the evidence shows." The defendant's attorney also stated: "Nobody's claiming here that the police were on a personal frolic. They were doing appropriate police business." Similarly, the defendant's attorney argued: "As I said before, there's no claim that [the police] were on some personal frolic or rogue cops or anything like that." Rather than focusing on the conduct of the police, the defendant based his defense, as it related to the two assault counts at issue, on evidence that he did not know that Baez and Lollar were police officers, that he mistook them for criminal intruders in his home and that he acted in self-defense when he approached Baez while brandishing a pistol.

During the court's charging conference, despite the fact that the court indicated that *Gallagher* had been overruled and the court did not include a *Gallagher* type of instruction in its charge,[8] the defendant did not object to the charge on the grounds raised here. In discussion concerning the court's instruction as to § 53a-167c, the defendant's attorney indicated that there was no issue in the case concerning the degree of force used by the police officers. Furthermore, the defendant's attorney stated that he was "in agreement" with the court's decision to instruct the jury with regard to self-defense only as to the assault count, § 53a-59, and to instruct the jury with regard to a mistake of fact defense only as to the assault of a peace officer count, § 53a-167c. After the court concluded its jury instructions, the defendant did not object on the grounds raised here.

The defendant does not claim that the court's instructions concerning the assault charges were technically inaccurate but claims that they did not guide the jury to consider whether the police had acted illegally and

---

[8] As set forth previously, our Supreme Court's decision in *Brocuglio*, which overruled *Gallagher* in part, is not retroactive. See footnote 2.

outside of their duties, and whether the defendant's privileges to resist such conduct applied. As stated previously, we evaluate the court's jury instructions to determine whether they are "correct in law, adapted to the issues and sufficient for the guidance of the jury." *State* v. *Heinemann,* supra, 282 Conn. 300. The court properly declined to deliver the *Gallagher* type of instruction requested, and we are not persuaded that the court improperly declined to comment, either in its instructions on the elements of the crime or otherwise, on related issues concerning the legality of the conduct of the police and whether it justified the conduct of the defendant.[9] With regard to the instruction concerning § 53a-167c, the court adequately instructed the jury to consider whether the police officers were engaged in a personal frolic or were acting "in the performance of [their] duties" at the time of the incident. We are not persuaded that under the circumstances presented by this case, any further explanation of that essential element of the crime was necessary.

We conclude that the instructions were adapted sufficiently to the issues before the jury because, at trial, the defendant did not raise any issues relating to the conduct of the officers or argue that he was exercising a privilege related to unlawful police conduct. The defendant's theory of defense related to his misperception of the identity of the men who had entered his

---

[9] To the extent that the defendant argues that certain defense instructions were omitted from the charge and he failed to request such instructions in accordance with our rules of practice, we are mindful that "[a] trial court has no independent obligation to instruct, sua sponte, on general principles of law relevant to all issues raised in evidence . . . . Rather, it is the responsibility of the parties to help the court in fashioning an appropriate charge." (Citation omitted; internal quotation marks omitted.) *State* v. *Arena,* 235 Conn. 67, 75, 663 A.2d 972 (1995). "The ever increasing refinement of our law justifies the cooperation of counsel in stating requests for jury instructions . . . ." (Internal quotation marks omitted.) *State* v. *Smith,* 212 Conn. 593, 612, 563 A.2d 671 (1989).

residence, and the record reflects that the court delivered instructions related to this defense. The defendant's trial attorney explicitly acknowledged that the defendant was not pursuing any issues related to whether the police were acting unlawfully, using unreasonable force or otherwise not acting in the performance of their duties. The defendant's attorney explicitly argued that such issues were not before the jury and that, to the contrary, the police were acting in the performance of their duties during the incident. Under those circumstances, we conclude that instructions related to the defendant's limited common-law privileges to resist certain types of unlawful police conduct were irrelevant to the issues actually before the jury and, thus, properly were omitted from the court's charge. We are not persuaded that any constitutional violation exists and reject all aspects of the defendant's claim.

II

The defendant next claims that the court improperly declined to instruct the jury with regard to the defense of renunciation. We disagree.

In a written request to charge, the defendant requested that the court deliver an instruction concerning the defense of renunciation.[10] During the on the record charging conference, the court asked the defendant's attorney to explain why the instruction was warranted. The defendant's attorney argued that the

---

[10] The request, listed among other distinct requests to charge, stated: "According to General Statutes § 53a-49 (c), a defendant is not guilty if he renunciates his attempted criminal conduct. When the actor's conduct would otherwise constitute an attempt under subsection (a) of this [statute], it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose." This request to charge was improper as a matter of form, as it did not set forth the evidence to which it applied. See Practice Book § 42-18.

evidence concerning the defendant's conduct just before he was shot by Baez supported the instruction. The defendant's attorney argued: "That at the time, [the defendant] was about to drop the gun. He didn't know whether it was a police officer or not. He was about to drop the gun, and he was shot. I believe that's enough to get into the area of renunciation. It's for [the jury] to determine whether or not that's enough of a renunciation under the statute to create a defense." The defendant's attorney also stated: "Once [the defendant] realized that it might actually be a police officer, he was about to throw down the weapon, and he was shot before he could do so. . . . [A] reasonable fact-finder could find that there was criminal conduct . . . but the defendant renunciated it . . . ."

The prosecutor argued that the defense did not apply to the evidence because the defendant claimed, both through his testimony and overall theory of defense, that he was not involved in any criminal conduct prior to the time of the alleged renunciation. The court remarked that the defendant's theory of defense was based on the defendant's mistaken perception of the identity of the men who had entered his residence and declined the request to charge as being unrelated to the evidence.

As he did at trial, the defendant claims that the court improperly refused his request to charge, arguing that the renunciation instruction "clearly was warranted" by the evidence presented by him. He argues that the evidence demonstrated that he "renunciated his attempted assault when he realized that the intruders were police officers."

As stated previously, the general test to be applied is whether the court's instruction was "correct in law, adapted to the issues and sufficient for the guidance of the jury . . . ." (Internal quotation marks omitted.)

*State* v. *Heinemann,* supra, 282 Conn. 300. As was the case in part I, we must determine whether the court improperly declined to deliver an instruction concerning a theory of defense for which there was a foundation in the evidence. See *State* v. *Adams,* supra, 225 Conn. 283.

"There are two relevant statutory provisions defining the elements of renunciation. Section 53a-49 (c) provides in part: When the actor's conduct would otherwise constitute an attempt . . . it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose. [General Statutes §] 53a-50 elaborates on the voluntariness requirement as follows: For purposes of this part, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct or to transfer the criminal effort to another but similar objective or victim." (Internal quotation marks omitted.) *State* v. *Servello,* 59 Conn. App. 362, 375–76, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000).

The defendant asserts that his testimony concerning the events just prior to the shooting supported the request for an instruction concerning the defense of renunciation. At trial, the defendant testified that after the officers entered his home, he believed that they were intruders who might inflict serious bodily injury on him and his family members. He went into a room to get his pistol from a closet, inserted bullets in the pistol and observed one of the intruders approaching him. After he aimed his pistol at the intruder, he heard

the intruder state, "police . . . throw your weapon to the ground." The defendant recalled hearing news reports about incidents in which criminals impersonated police officers to gain entry into homes for the purpose of committing crimes therein. The following colloquy, during defense counsel's direct examination of the defendant, then transpired:

"Q. At some point, did you decide to put down your pistol?

"A. Yes.

"Q. When was that, sir?

"A. I pointed the pistol and I thought this might really be a cop, and I went to put it down—

"Q. All right. Did the gun fire, your gun?

"A. No, it did not fire.

"Q. Did you pull the trigger of that gun?

"A. No.

"Q. All right. After you say you decided to throw it down because it might be a police officer, then what happened?

"A. I lowered my arm, and I heard the first shot, and it hit me on the arm. And then the others came."

During cross-examination, the defendant again testified that he was shot at the same time that he decided to lower his pistol. The defendant stated: "I decided to lower the weapon, but that's when I got the shot." He testified that he dropped the pistol in the location where he was standing when he was shot, stating: "I was lowering [the pistol] and . . . I was shot in the same elbow of the same hand."

We agree with the court that an instruction concerning the defense of renunciation was not warranted by

the evidence presented. Viewing the evidence in the light most favorable to the defendant, we do not conclude that the defendant presented evidence that he abandoned an effort to commit a crime. First, under the defendant's theory of the case, the defendant was not engaged in any criminal conduct prior to the time of the shooting but was acting in defense of himself and his family. Thus, it is unclear how the evidence on which he relies could be construed such that he completely and voluntary renounced a criminal purpose just prior to the shooting. Second, the evidence unambiguously established that at the time the renunciation allegedly occurred, the defendant already had committed the conduct underlying the charges against him. Thus, assuming that the jury accepted the defendant's version of the facts as true, it cannot be said that the defendant abandoned his effort to commit a crime or otherwise prevented its commission. See *State* v. *Osoria*, 86 Conn. App. 507, 516, 861 A.2d 1207 (2004), cert. denied, 273 Conn. 910, 870 A.2d 1082 (2005). For these reasons, we conclude that the court properly declined to instruct the jury with regard to the defense of renunciation.

### III

Finally, the defendant claims that the court deprived him of his right to a fair trial by referring to the police officers as "victims" during its charge. The defendant argues that the court relieved the state of its burden of proving these charges in that the court implied that he had assaulted the officers and was therefore guilty of the assault crimes. We disagree.

During its charge, the court used the term "victim" several times. In its instruction concerning the essential elements of § 53a-167c, the court stated that the state bore the burden of proving "[t]hat the victim of the assault was a reasonably identifiable police officer." In

its instruction on self-defense, which applied to the assault in the first degree charge, the court stated: "Deadly physical force may not be used unless the actor, meaning the defendant, reasonably believes that such other person, meaning the victim in this case, is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on him." The court also stated that the defendant could consider different "acts of the victims" in evaluating the threat posed. Further, the court stated: "In this case, if you find proven beyond a reasonable doubt that the victim was not using or about to use deadly physical force or [to] inflict great bodily harm upon the defendant, and if you further find proven beyond a reasonable doubt that the defendant has no reasonable belief that the victim was using or about to use deadly physical force or about to inflict great bodily harm upon the defendant, then the defendant would not be justified in using deadly physical force upon the victim."

Immediately after the court concluded its charge, but before the court excused the jury to begin its deliberations, the court, at the prosecutor's request, held a sidebar conference with the attorneys. Immediately thereafter, the court instructed the jury as follows: "All right. Two things. If I used the word victim, and I think it's specifically like in reference to Detective Baez, that doesn't mean I see him as a victim or anything like that. That's for you to decide, okay?" The record does not reflect an objection by either party to the court's use of the term victim or to its curative instruction related thereto.

The defendant requests review of his claim under the doctrine enunciated in *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the claim under *Golding* because the record is adequate for review and the issue is of constitutional magnitude. With regard to the latter determination, we are mindful that a court's use of the

term victim during its charge may deprive a defendant of his due process right to a fair trial. See *State* v. *Cortes*, 84 Conn. App. 70, 85–86, 851 A.2d 1230 (2004), aff'd, 276 Conn. 241, 885 A.2d 153 (2005).

"The jury charge is used to convey to the jury the legal principles that apply to the matters before it. Certainly, clarity in jury instructions is a necessity that serves the ends of justice. Yet, as is often the case in unrelated contexts, certain words used in jury instructions can be capable of different interpretations. The appellate courts of this state have had occasion to consider the ambiguous nature of the term 'victim.' In *State* v. *Cortes*, [supra, 84 Conn. App. 86], this court held that the trial court's pervasive use of the term in its jury charge deprived the defendant of a fair trial. The defendant in *Cortes*, convicted of crimes against his former girlfriend, disputed that any crime at all had been committed against the complainant. Id., 75–76. At trial, the defendant objected to the use of the term victim, to no avail. Id., 84. This court reasoned: 'In cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term "victim" is not inappropriate. In cases in which the fact that a crime has been committed is contested, and where the court's use of the term "victim" has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief that a crime has been committed against the complainant.' Id., 86. As our Supreme Court opined in *Cortes*, the jury could have drawn only one inference from the trial court's repeated use of the term, where the very commission

of a crime was at issue, namely, that the defendant had committed a crime against the complainant. *State* v. *Cortes*, 276 Conn. 241, 249 n.4, 885 A.2d 153 (2005)." *State* v. *Santiago*, 100 Conn. App. 236, 252–53, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 152, 153 (2007).

The defendant takes issue with the court's use of the term at six specific points in its charge, as set forth previously. We do not consider this use of the term to be pervasive. As explained previously, the court's use of the term victim in its charge was not the subject of an objection. Nevertheless, the court delivered a curative instruction, immediately following its charge and prior to the start of jury deliberations, in which it clarified its intent in using the word victim in its charge. This is not a case in which the court used the term "victim" without explanation. The court unambiguously eliminated any improper connotation that the jury could infer from the court's use of the term by reminding the jury that it was the finder of fact and that the court did not view Baez to be the victim of any crime. Accordingly, we conclude that the defendant has not demonstrated that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial; the claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.