## STATE OF CONNECTICUT *v.* DOUGLAS BENNETT

HOUSE, C. J., LOISELLE, BOGDANSKI, BARBER and MACDONALD, Js.

Argued February 6—decision released May 11, 1976

48

*James M. Merberg,* of the Massachusetts bar, with whom was *Aaron P. Slitt,* for the appellant (defendant).

*Bernard D. Gaffney,* assistant state's attorney, with whom, on the brief, was *George D. Stoughton,* state's attorney, for the appellee (state).

MacDonald, J.  On a trial to a jury, the defendant was found guilty of one count of robbery in the second degree, in violation of § 53a-135 of the General Statutes, one count of kidnapping in the second degree, in violation of § 53a-94, one count of sexual contact in the first degree, in violation of § 53a-78 (a) (1), one count of rape in the first degree, in violation of § 53a-72 (a) (1), and two counts of deviate sexual intercourse in the first degree, in violation of § 53a-75 (a) (1).  On his appeal to this court, the defendant has raised six issues, having abandoned four of those originally contained in his preliminary statement of issues.  The issues raised pertain to claimed errors in (1) admitting into evi-

dence photographs taken of the defendant and certain statements made by him to a police officer; (2) the court's instructions to the jury with respect to the extent of corroboration required to prove the commission of the sex offenses charged; (3) instructions of the court with respect to unfavorable inferences to be drawn from failure of the defendant to call a purported alibi witness; (4) denial of the defendant's motion to read certain testimony of defense witnesses to the jury; (5) remarks to the jury by the court claimed to be coercive; and (6) denial of the defendant's motion for permission to present evidence of a polygraphic examination of the defendant made subsequent to the trial.

As background for the consideration of the claimed errors, it is necessary to present only a brief summary of the forcible robbery, abduction and sexual abuse of the victim which occurred during a one-hour period on the evening of February 14, 1974, in Wethersfield, and of the investigative procedure which eventually led to the arrest of the defendant. The defenses claimed having been mistaken identity and alibi, the basic facts involved in the crimes committed and preceding the trial are not in dispute and the preliminary statements contained in the briefs provide the following facts necessary for our discussion: On the evening in question, at about 7 o'clock, Miss M,[1] who lived with

---

[1] In consideration for the victim of these crimes and because of the nature of the evidence produced, we will follow the practice adopted in *State* v. *Jonas,* 169 Conn. 566, 567 n.1, 363 A.2d 1378, and *State* v. *Oliver,* 161 Conn. 348, 288 A.2d 81, and will not reveal the identity of the victim or her father. Further, since no claim has been made that the various offenses, if proved, were not within the statutory definitions of those offenses, the particulars need not be discussed.

her parents in a one-family residence in Wethersfield and who was alone in the house at the time, was confronted by a man carrying a handgun and wearing a stocking mask who forced his way into the house and said, "Where is Howard? Howard owes me money." After making an obscene remark about "Howard" (the first name of Miss M's father) and taking Miss M's wallet containing $54, the man tied her hands behind her back, placed a strip of masking tape across her eyes, dragged her outside, disrobed her and sexually assaulted her. Thereafter, he was joined by another man who drove up in a car, and the two of them proceeded to force Miss M into the back seat of the car. During the next hour, the masked assailant removed his mask and, as the car was driven about, proceeded to rape and sexually abuse Miss M and to assist his companion to sexually abuse her. No purpose would be served by further describing the victim's hour of horror and abuse since the defendant does not claim that the acts charged against the assailant did not actually occur.

After her release, Miss M ran to her home and at about 9 p.m. John S. Karangekis, a detective of the Wethersfield police department, arrived there to investigate her complaint. He and, later, a physician examined physical evidence upon Miss M's body and clothing indicating that an attack actually had occurred, and Karangekis obtained from her a detailed account of what had happened, including a description of the assailant and of his verbal references to "Howard." With reference to the description of her assailant, Miss M stated that the masking tape covering her eyes had come loose and that she was able to see his face and various features as they were next to each other in the car

at a time when it was stopped in a well-lighted area. Howard M, the victim's father, disclosed to Karangekis that the description of the assailant fitted that of Douglas Bennett, a man who had worked for his company during the previous two months and who, through an oversight, had not been paid and was owed $105, and, further, that Bennett owned a blue parka and hood similar to the one described by Miss M as having been worn by her assailant. About a week after the assault, Miss M went to state police headquarters where she put together a composite of a face which resembled her assailant, a photograph of which was eventually received into evidence during the trial.

On February 28, 1974, Karangekis went to Bennett's home in Granby, Massachusetts, accompanied by a Granby police officer, and, after identifying himself as a Connecticut police officer, advised Bennett that he was investigating a crime that had occurred in Connecticut and was there for the purpose of taking a look at him and ascertaining if he could answer some questions. He then asked Bennett: "Do you know a Howard M—?" (using the victim's father's name) to which Bennett immediately replied: "I certainly do. He still owes me some money." Karangekis then asked if he could take pictures of Bennett, to which Bennett agreed, after which Karangekis photographed Bennett with a Polaroid camera which he had brought with him. It is agreed by counsel that at no time during the interview or prior to the taking of the pictures was Bennett advised that he was a suspect or given the so-called *Miranda* warning; see *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694; and that at no time was he arrested, physically restrained or in custody.

## I

It is claimed by the defendant that the trial court erred in admitting into evidence, over his objection, the photographs of the defendant taken at his home by Karangekis and the results of an out-of-court photographic identification on the ground that the photographs were illegally obtained in violation of the defendant's constitutional rights by reason of the fact that the pictures were taken without first advising him of his right to remain silent, his right to advice of counsel before answering questions, and the other caveats of the *Miranda* warning. Error also was claimed, on the same ground, in the admission into evidence of the defendant's answer to Karangekis' question as to whether he knew Howard M, it being claimed that the defendant, at the time this evidence was obtained, was suspected of having been involved in the crimes in question and therefore should have been informed of his constitutional rights. It is not claimed that the defendant was under arrest or any kind of physical restraint at the time of the interrogation, but only that he was a "prime suspect." The evidence showed clearly that the meeting took place in the living room of the defendant's own home in Granby, and that at no time was the officer's attitude toward him in any respect accusatory.

There is nothing in the record to indicate that the defendant's statement to Karangekis about Howard M and his consent to being photographed were other than purely voluntary, and the court in *Miranda* v. *Arizona,* supra, 478, clearly qualified its opinion by pointing out that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected

by . . . [this decision]." It further clearly limits the application of the exclusionary rule therein stated to custodial interrogation and defines that term (p. 444) as follows: "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In the absence of any claim that he was in custody or "otherwise deprived of his freedom of action in any significant way," the defendant apparently seeks to apply the *Miranda* rule because he was a suspect and became a "prime suspect" during the interview. Perhaps he indeed became a "prime suspect" after the interview and as a result of the victim's identification of the photographs at a later date, but until that later date it scarcely could be said that the investigation had even focused on him, but, even if it had, that fact alone would not have required the *Miranda* warning. "It appears that in this case the questioning of the defendant was in the course of routine investigatory information-gathering, that the investigation had not focused on the defendant as an accused, and that the questioning was in no sense a custodial interrogation. We discussed a somewhat similar interrogation in *State* v. *Szabo,* 166 Conn. 289, 348 A.2d 588. There is no need to repeat the authorities cited in that case. They fully support the ruling of the trial court that in the

circumstances of the present case the statements of the defendant were properly admitted despite the absence of a *Miranda*-type warning." *State* v. *Schaffer*, 168 Conn. 309, 314, 362 A.2d 893. Two recent decisions by the United States Court of Appeals for the Second Circuit further support our conclusion as to the correctness of the court's ruling. See *United States ex rel. Sanney* v. *Montanye*, 500 F.2d 411, 416 (2d Cir.); *United States* v. *Hall*, 421 F.2d 540, 543 (2d Cir.).

## II

With respect to the defendant's claim that the court erred in failing to instruct the jury that every element of a sex offense must be corroborated, little need be said in view of our decision in *State* v. *Jonas*, 169 Conn. 566, 363 A.2d 1378, where we sustained as correct a jury charge (p. 576 n.4) quite similar to that given by the court in this case, stating (p. 575): "We are in accord with the comment drafted by the commission to revise the criminal statutes as to the intended effect of § 53a-68:[2] 'Although this language was taken from the New York law, it is not meant to incorporate the New York rule that every element of the offense must be corroborated; rather, it was meant to require corroboration only of at least one element of the crime.'" We find no error in the court's charge with respect to the requirement of corroboration.

## III

It is claimed by the defendant that the court erred in instructing the jury that they might draw an unfavorable inference from his failure to produce

---

[2] Section 53a-68, requiring corroboration of the victim's testimony in sex offenses, was in effect at the time of the offenses involved in this case, but was repealed by Public Acts 1974, No. 74-131.

an out-of-state alibi witness in the absence of evidence that the witness was available or that the witness was not available to both sides. The court's charge on this point, which includes a comprehensive summary of the facts relevant to the issue, is set forth in the footnote.[3] The applicable law was stated by us in *Queen* v. *Gagliola,* 162 Conn. 164, 168, 292 A.2d 890. "The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. The party against whose cause an unfavorable inference is claimed, may, of course, offer evidence to explain the failure to produce the witness. There are two requirements for the operation of the rule: (1) The witness must be available; (2) he must be a witness whom the party would naturally produce." This rule, first stated by this court in *Secondino* v.

[3] "In the course of the arguments in this case, attention was called by the state to the failure of the defendant to call an expert witness who, it was claimed, might by her testimony have thrown light upon the situation before you. The defendant has testified that on the evening of February 14th, 1974, he, in company with his six-year-old daughter, transacted some business at the Hampshire National Bank in South Hadley with a teller, whose identity is known to the bank president, Mr. Johnston, who was a witness for the defendant, and whom the defendant knows by sight. The teller was not called as a witness for the defense. It is true that where a party fails to call to the stand a witness who, if called, could testify as to any material fact, and where it is within the sole or peculiar power of that party to call that witness, you are entitled to infer that had that witness testified, the testimony would have been unfavorable to the party failing to call him or her, and to consider that fact in arriving at your decision. You must, however, first reasonably conclude that the person not called could give material testimony and that it was within the sole or peculiar power of the party failing to call the witness to put him upon the witness stand. If it is equally within the power of either party to call the witness, and neither does, then there is no basis for inference that the testimony, if given, would be unfavorable to either party."

*New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598, recently was held applicable to criminal as well as civil cases in *State* v. *Annunziato,* 169 Conn. 517, 536, 363 A.2d 1011.

That the identity of the bank teller mentioned in the court's charge was known to the defendant, or, at least, could have been obtained long before the commencement of the trial, is obvious from the record. It appears even more obvious that if the testimony of the defendant was true that he had had personal contact with the teller in South Hadley at the very critical hour vital to his alibi defense, then that teller could be expected to have peculiar or superior knowledge pertaining to the issue of alibi raised by the defense. The main thrust of the defendant's argument appears to be that the witness was unavailable, or, if available, was equally available to the state. Any claim of unavailability completely ignores the testimony of Edward D. Johnston, the president of the bank which employed the teller, that at the very time of trial she was employed at the office of the city clerk in Chicopee, Massachusetts, which can hardly be classified as a place difficult to locate or remotely situated with respect to the place of trial in Hartford. The defendant, however, argues that even if available, the bank teller was equally available to both parties under the uniform subpoena powers applicable to out-of-state witnesses; General Statutes § 54-22 (c); and that, therefore, no inference could be drawn. This is a more narrow interpretation of the word "available" than was suggested in *Turner* v. *Scanlon,* 146 Conn. 149, 148 A.2d 334, where this court (p. 161) approved a charge to the jury "that if it was within the power of both to bring the report into court, no inference unfavorable to either could

be drawn, but that if the jury found that the report was so related to the whole proof in the case that one of the parties and not the other would be expected to produce it, an inference would be justified that the report, if produced, would be unfavorable to that party." "However, the term 'available' is not to be construed as meaning merely the accessibility for service of process. The determination of the question of equal availability may in a given situation involve the consideration of many factors. Such matters as one party's superior means of knowledge of the existence and identity of the witness . . . [and] of the testimony that might be expected from him . . . with reference to the case are to be considered. It is manifest, therefore, that in passing upon this question of equal availability, the trial Judge is called upon to take into account all of the attendant facts and circumstances bearing upon the situation of the witness with relation to the parties, respectively." 2 Wigmore, Evidence (3d Ed.) § 288 (1970 Sup.), p. 81; see 29 Am. Jur. 2d, Evidence, § 180, and authorities there cited.

No claim is made by the defendant that the identity of the teller was disclosed to the state prior to trial in accordance with the rules of discovery in criminal cases, as required by Practice Book § 533G,[4] and at no time during the proceedings was the name of the teller made known to the state, nor was the

[4] "[Practice Book] Sec. 533G. [DISCOVERY AND INSPECTION IN CRIMINAL CASES] —Discovery by State: Alibi If the defendant intends to offer as a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime, or to call witnesses in support of such defense, he must at the commencement of trial serve upon the state, and file a copy thereof with the court, a 'notice of alibi' reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the name of every such alibi witness upon whom he intends to rely. . . ."

importance of the teller's testimony to the alibi defense revealed until the trial had almost concluded. The state was under no obligation to introduce an alibi witness; *State* v. *Mitchell,* 169 Conn. 161, 167, 362 A.2d 808; and, in any event, was unable to act without a disclosure of the witness' identity. The defendant knew or, according to the evidence, easily could have learned the name of the teller and, in failing to produce her or to explain her absence, acted at his own peril. *Teitelman* v. *Bloomstein,* 155 Conn. 653, 662, 236 A.2d 900. We find no error in the court's charge as to the circumstances and conditions under which it would be permissible for them to draw an inference from the defendant's failure to produce the teller as an alibi witness.

## IV

After some time spent in deliberation, the jury forwarded to the court a request for the reading of the testimony of four of the state's witnesses, and the court complied with this request by ordering the reporter to read the requested testimony. Defense counsel objected to this procedure unless the testimony of all defense witnesses also was read, making a motion to that effect. The court denied that motion, noting that such additional reading had not been requested by the jury,[5] and the requested portion of the testimony was read as ordered, an exception being duly noted. " 'No good reason occurs to us why a jury may not, at times . . . during the consideration of cases before them, be permitted . . . to have read to them parts of the

---

[5] "The Court: I have no request from the jury that they need their recollections refreshed by any additional reading of the testimony. It may very well develop that after this is read they may want some testimony read, but at this point, this is what the jury has requested, and this is what the court will comply with."

official court stenographer's shorthand notes of the testimony . . . .' What portions of the record, if any, will be submitted to the jury for their consideration is a matter of sound judicial discretion." *State* v. *Cari,* 163 Conn. 174, 184, 303 A.2d 7; see *Coy* v. *Milford,* 126 Conn. 484, 490, 12 A.2d 641; *State* v. *Rubaka,* 82 Conn. 59, 67, 72 A. 566. The court did not abuse its discretion in ordering to be read to the jury only that portion of the testimony requested.

### V

In accordance with our decision in *State* v. *Van Valkenburg,* 160 Conn. 171, 174, 276 A.2d 888, we will consider, although it was not properly raised in accordance with Practice Book § 249, the claim that the court made "suggestive, influential and coercive remarks to the jury during their deliberation," thus depriving the defendant of "his right to a fair and impartial trial as guaranteed by the sixth and fourteenth amendments of the constitution." Whether a jury were coerced by statements of the trial judge is to be determined by an examination of the record. *Jenkins* v. *United States,* 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957; *Hyde* v. *United States,* 225 U.S. 347, 383, 32 S. Ct. 793, 56 L. Ed. 1114. The record here indicates that the defendant's trial counsel, an experienced criminal trial lawyer, took no exception to the remarks of which the defendant now complains, and a reading of those remarks in the light of the circumstances under which they were made appears to justify his failure to object or take exception. The circumstances which existed at the time the remarks complained of were made may be summarized from the record as follows: The jury had commenced its deliberations in midafternoon of the eighth day of

the trial, and, before adjourning court that afternoon, the court explained the procedure it intended to follow as to the hour of adjournment each day.[6] The jury deliberated all of the succeeding day and until 2:10 p.m. of the third day when the forelady, Anne M. Carpenter, sent a message to the court requesting a reading of certain testimony as previously discussed in this opinion. At 2:45 p.m. occurred the colloquy containing the remarks claimed to be coercive, as fully set forth in the footnote.[7] Even the apparently unimportant and conversational portions of the colloquy have been included in the footnote to indicate the rather chatty, informal and obviously noncoercive nature of the conver-

[6] "The Court: All right. My policy, members of the jury, is to, at five o'clock, inquire of the jury whether they have reached a verdict—not reached a verdict, obviously, they haven't, or you'd be out, whether or not you are reasonably near a verdict and whether or not a little more time is needed, and you would be able to arrive at a verdict. If you don't feel that that is so, and if you feel that you are far from reaching a verdict, then if you would wish, I will excuse you. So let's see how you progress and see what your status is at five o'clock. I will call you in at that time."

[7] "The Court: The gentlemen, if you want to take your coats off, it is perfectly all right. It is a little warm here. You may proceed. I understand the reading of this is going to take probably until seven o'clock, just the reading you have requested, you should have read to you. My question to you as jurors now is can you all stay tonight and finish this case?

Mrs. Carpenter: Could we discuss this for a minute?

The Court: I call it to your attention that from now until Tuesday is a long time for anyone, for any reason something happens to someone who can't come or catch cold, or who becomes ill, we may end up in a mistrial and have to try it all over again. This is one of the pitfalls I suppose of being a juror. It doesn't happen very often, but it has happened on our case. If we aren't finished by five o'clock on Friday.

The Jury Forelady: May we be excused, Your Honor, to talk amongst ourselves for a few moments?

The Court: Yes. I am going to let you.

(The jury left the courtroom.)

(The jury returned to the courtroom.)

The Jury Forelady: We'd be happy to stay if we could just

sation. "The judge's statements, to a jury which had shown no indication of a deadlock, were made 'because of the hour' to explain the reason for retaining them through suppertime and to explain the potential for mistrial if a released juror were to become ill overnight." *State* v. *Ralls,* 167 Conn. 408, 423, 356 A.2d 147. The mere enlightenment of the jury's understanding of the extent of their duties and responsibilities is not to be interpreted as influencing their judgment. *Wissel* v. *United States,* 22 F.2d 468, 471 (2d Cir.). The language particularly criticized as coercive appears to be the court's inquiry: "My question to you as jurors now is can you all stay tonight and finish this case?" Certainly under the circumstances heretofore outlined, this was little more than what was characterized in *Tough* v. *Ives,* 162 Conn. 274, 280, 294

make a couple of phone calls, and we feel we could reach a verdict by seven o'clock if we hear the testimony.

The Court: That will take until seven o'clock to hear it. You mean shortly after that, before a later hour, you'd be able to reach a verdict?

The Jury Forelady: Yes.

The Court: How many want to make phone calls?

The Jury Forelady: Myself and two or three others.

The Court: We will recess then and will make phones available.

(The stenographer completed a reading of only a portion of the testimony requested when the forelady interrupted the reading and the following occurred.)

The Jury Forelady: We heard enough, Your Honor.

The Court: Are you all agreed that you have heard sufficient?

The Jury: Yes.

The Court: All right. Do you wish to hear any testimony of Mr. M?

The Jury Forelady: No.

The Court: Are you all agreed to that?

The Jury: Yes.

The Court: All right, and I shall ask you to resume your deliberations.

(The jury returned to the jury room at 7:37 p.m.)

(The jury announced that it had agreed upon a verdict about five minutes after retiring.)"

A.2d 67, as a "neutral inquiry" entirely free of coercion. This characterization is further strengthened by the forelady's assurance to the court, immediately thereafter, that "we feel we could reach a verdict by seven o'clock if we hear the testimony"— the reading of which had just been requested. The language of the courts in the various remarks quoted in the defendant's brief are examples of coercive suggestions under circumstances wholly unlike those present here. "We cannot conclude that, in the context and under the circumstances in which the statements were made, the jury were, actually or even probably, misled or coerced." *State* v. *Ralls,* supra, 426.

## VI

With respect to the defendant's final claim that the court erred in denying his motion for consideration of his polygraphic examination which was conducted after conclusion of the trial, little need be said beyond the observation that it involved matters which never were placed before the trial judge or the jury at any time. There is no evidence of any polygraphic examination during the trial, and the test results which the defendant sought, by his motion, to place before the court arose from an examination conducted long after the conclusion of the trial and were not properly included in his brief or argument before this court. The court correctly denied the defendant's motion to consider the proffered evidence.

There is no error.

In this opinion the other judges concurred.