# STATE OF CONNECTICUT *v.* TIFFANY BROWN
## (AC 28924)

Gruendel, Beach and Alvord, Js.

Argued September 3—officially released December 15, 2009

*Heather M. Wood,* deputy assistant public defender, for the appellant (defendant).

*Susann E. Gill,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* former state's attorney, *John C. Smriga,* supervisory assistant state's attorney, and *Toni M. Rosario-Smith,* senior assistant state's attorney, for the appellee (state).

### Opinion

GRUENDEL, J. The defendant, Tiffany Brown, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3). On appeal, the defendant claims that (1) there is insufficient evidence

to support her conviction of manslaughter in the first degree, (2) the court's allegedly improper jury instructions violated her due process rights and (3) the court improperly denied her motion to suppress. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Daayon Devane, were involved in a romantic relationship for six or seven months. Throughout their relationship, the defendant and the victim engaged in several arguments that escalated into physical altercations. Not once did the defendant call the police for assistance when such altercations arose. Instead, according to the defendant, on some occasions, she brandished a knife to quell such altercations, and, in each instance, the victim left her apartment.

On the morning of February 22, 2005, the defendant, sensing the possibility of another altercation with the victim, walked to the police station across from her apartment to obtain assistance. At the defendant's request, the police removed the victim from her apartment. Later that evening, the defendant and a friend drove to a pool hall where they saw the victim. There, the victim informed the defendant that he had been kicked out of his mother's house and, promising to be on his best behavior, asked to return to her apartment. The defendant acquiesced and together they left the pool hall in the early morning of February 23, 2005.

Upon returning to the defendant's apartment, the victim became enraged with the defendant for speaking with "mad dudes" at the pool hall. The victim grabbed the defendant's arm, hit her and pushed her. The defendant then entered the kitchen and brandished a steak knife, instructing the victim to "chill." As the altercation escalated, the victim followed the defendant into the kitchen, and she stabbed him in the neck with the steak

knife. After being stabbed, the victim exclaimed, "yo, babe, look what you've done," exited the defendant's apartment, ascended the stairs to the second floor of the apartment complex, collapsed and eventually died from blood loss.

When police officers arrived at the second floor landing of the defendant's apartment complex, they found the defendant cradling the victim. The defendant made several statements in the presence of the police officers. Officer David Payne and Detective Michael Fiumidinisi heard the defendant address the victim: "Wake up, wake up; I didn't mean to do it." Payne then asked the defendant about the identity of the victim, to which she responded: "He's my boyfriend; he came at me." The defendant told Fiumidinisi: "Mike, I can't wake [the victim] up."[1] Fiumidinisi told the defendant to stop cradling the victim to allow medical personnel to assist him. As medical personnel began to assist the victim, Fiumidinisi also asked the defendant about the identity of the victim, to which she responded: "[He] was my boyfriend, and I stabbed him." Next, Fiumidinisi told the defendant that she was under arrest and placed her inside of a police car. While the defendant was alone in the police car, an officer standing nearby heard the defendant proclaim repeatedly: "He was beating me. I told him to get away from me. Then he fell on the knife. I didn't mean to stab him." From there, the defendant was transported to the police station, where she was advised of her *Miranda*[2] rights before providing a written statement in which she claimed that the victim had run into the knife. Thereafter, a jury trial followed, at the conclusion of which the jury found the defendant guilty of manslaughter in the first degree, and the court

[1] The defendant recognized Fiumidinisi from a previous investigation in which the defendant was the victim of or a witness to a crime.

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

rendered judgment accordingly. From that judgment, the defendant appeals.

I

The defendant claims that there was insufficient evidence to support her conviction of manslaughter in the first degree pursuant to § 53a-55 (a) (3). Specifically, the defendant maintains that the state failed to prove beyond a reasonable doubt that she created a grave risk of death and that she evinced an extreme indifference to human life. We disagree.

We review the defendant's claim, which she preserved through her motions for a judgment of acquittal; see *State* v. *Padua,* 273 Conn. 138, 146 n.12, 869 A.2d 192 (2005) (motion for judgment of acquittal on specific charge preserves charge for appeal); initially by setting forth our standard of review. "When reviewing sufficiency of the evidence claims, we [apply] a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Wideman,* 36 Conn. App. 190, 202, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995).

Moreover, "[w]e note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the

evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

"[T]he statute on manslaughter in the first degree . . . provides in relevant part: A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. For the defendant to have been found guilty of this offense, the state had to prove beyond a reasonable doubt the following: (1) that the defendant engaged in conduct that created a grave risk of death; (2) that in doing so the defendant acted recklessly; (3) under circumstances evincing an extreme indifference to human life; and (4) the defendant caused the death of the victim. . . . Additionally, the state had to prove that the defendant had the general intent to engage in conduct that created a grave risk of death to another person under circumstances evincing extreme indifference to human life." (Citations omitted; internal quotation marks omitted.) *State* v. *Best*, 56 Conn. App. 742, 753–54, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000).

The defendant concedes that, acting recklessly, she caused the victim's death. She challenges the jury's finding that she acted under circumstances evincing an extreme indifference to human life and that she created a grave risk of death to the victim as a result of her conduct.

"Our Penal Code does not define, in title 53a of the General Statutes, what constitutes extreme indifference to human life [or grave risk of death]. . . . Therefore, it is appropriate to look to the common understanding

of the term[s] as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *McCoy*, 91 Conn. App. 1, 4, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005). In examining what constitutes an extreme indifference to human life, "we have stated that the legislature modified the level of indifference required with the adjective extreme, which has been defined to mean existing in the highest or greatest possible degree. . . . It is synonymous with excessive. . . . Extreme indifference to human life has been defined accurately, in part, as more than [m]ere carelessness or ordinary recklessness. . . . Extreme indifference to human life also has been defined accurately, in part, as a high degree of disinterest to human life." (Citation omitted; internal quotation marks omitted.) Id. "What evinces an extreme indifference to human life is really a question of fact." *State* v. *Best*, supra, 56 Conn. App. 755. Further, in examining what constitutes a grave risk of death, this court has noted that Webster's Third New International Dictionary "defines the adjective 'grave' as meaning 'very serious; dangerous to life.' " Id., 756.

Viewed in the light most favorable to sustaining the defendant's conviction, the evidence was sufficient to prove that the defendant evinced an extreme indifference to human life. The jury could have found that the defendant stabbed the victim in the neck. During her physical altercation with the victim, the defendant, by her own admission, entered the kitchen and brandished a steak knife. Upon discovering the defendant next to the unconscious victim, Fiumidinisi testified, the defendant told him that she had stabbed the victim. Peter DeForest, a professor of criminalistics at the John Jay College of Criminal Justice, testified that it was possible that the wound occurred as a result of a downward thrust of the knife and that he could not exclude any possibility as to what caused the knife to penetrate the victim's neck. Susan Williams, a forensic pathologist,

testified that her examination of the wound indicated that the knife entered the victim's neck "at a steep angle . . . basically downward and a little bit backward." An autopsy revealed that the wound itself extended three to four inches within the right side of the victim's neck and into his chest cavity, piercing his carotid artery and the top of his lung. Williams further testified that the victim's injuries were so severe that emergency medical technicians would likely have been unable to prevent the victim's death had they been there to instantaneously administer medical treatment the very moment the victim was stabbed. Further, contrary to the defendant's assertion that she dropped the knife immediately after the victim was stabbed, the jury heard testimony that the knife was discovered next to mattresses and old furniture underneath the stairwell of a maintenance building near the defendant's apartment complex. Accordingly, on the basis of the cumulative effect of all of the evidence, the jury could have concluded reasonably that the defendant engaged in conduct evincing an extreme indifference to human life.

The jury also could have found that the defendant's conduct created a grave risk of death. In reviewing convictions of manslaughter in the first degree, this court has observed that "[t]he facts of those cases demonstrate that the grave risk of death associated with the subject conduct are within the common knowledge of a layperson and that no expert testimony would be necessary to educate the jury." *State* v. *Wade*, 106 Conn. App. 467, 486, 942 A.2d 1085, cert. granted on other grounds, 287 Conn. 908, 950 A.2d 1286 (2008) (appeal withdrawn June 12, 2008). In the present case, we are unable to conclude, as a matter of law, that the grave risk of death inherent in stabbing a person in the neck with a steak knife is without the common knowledge of a layperson. Accordingly, the defendant's claim fails.

II

The defendant raises two claims regarding the court's charge to the jury, arguing that the court's allegedly improper instructions violated her due process rights.

A

The defendant first claims that the court diluted the state's burden of proof by improperly instructing the jury on self-defense. We disagree.

Before reviewing the merits of the defendant's claim, we first address the state's contention that we should decline to review the defendant's claim because, with respect to the instruction at issue, the defendant waived any right to challenge that charge on appeal. The facts that follow are relevant to our resolution of this claim. The defendant filed a written request to charge, pursuant to which she asked the court to instruct the jury on only deadly physical force when considering self-defense. Specifically, the written request provided: "In this case, we are talking about the use of deadly physical force by the defendant. It is therefore the last portion of that section of the statute on self-defense that is implicated in this case . . . ." Rejecting the defendant's request to charge, the court instructed as to both deadly and nondeadly physical force. The court's instructions provided: "The first issue that you must resolve is whether the defendant used deadly or nondeadly force. This is a question of fact for you to decide after a full consideration of the evidence." After the court concluded reading its instructions to the jury, the defendant took exception to the charge and asked the court to instruct pursuant to her written request to charge. The court declined.

For the first time on appeal, the defendant claims that the court diluted the state's burden of proof by failing to inform the jury that it must apply the beyond

a reasonable doubt standard of proof in considering whether she applied deadly or nondeadly force. Having failed to preserve her claim, the defendant seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] *Golding* provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Fabricatore*, 281 Conn. 469, 477, 915 A.2d 872 (2007).

That the first two prongs of *Golding* are satisfied in the present case is uncontested. The record is adequate for review, and the defendant's claim is of constitutional magnitude because it involves her fundamental due process right to a proper jury instruction. See *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). Accordingly, we consider whether the alleged constitutional violation clearly existed and clearly deprived the defendant of a fair trial.

"In *State* v. *Fabricatore*, [supra] 281 Conn. [478], we stated that '[i]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved

_____

[3] The defendant concedes that her claims are not preserved. We agree because she neither filed a request to charge covering these matters nor took exception to such. See Practice Book § 42-16.

at trial, at least was not waived at trial.' . . . We generally do not review unpreserved, waived claims. . . . 'To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court.' " (Citations omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009). Recently, in *State* v. *Ebron*, 292 Conn. 656, 975 A.2d 17 (2009), our Supreme Court elucidated the principles governing the reviewability of claims of instructional error in which a party has acquiesced to the court's charge. The court in *Ebron* concluded that a defendant will be deemed to have waived an objection to an instruction only if he "actively induced the trial court to act on the challenged portion of the instruction." Id., 680. In the present case, the court rejected the defendant's request to charge. The defendant could not have actively induced the court by virtue of the fact that the court specifically rejected her requested charge. Accordingly, the defendant did not waive her claim, and, therefore, we consider the merits.

We first set forth our standard of review. "A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Internal quotation marks omitted.) *Mann* v. *Regan*, 108 Conn. App. 566, 576, 948 A.2d 1075 (2008). "It is well settled that jury instructions are to be reviewed in their entirety. . . . When the challenge to a jury instruction is of constitutional magnitude, the standard of review is whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement . . . . Individual instructions also are not to be judged in artificial isolation . . . . Instead, [t]he test to be applied . . . is

whether the charge . . . as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Makee R.*, 117 Conn. App. 191, 198, 978 A.2d 549 (2009).

The defendant directs our attention to one particular part of the court's instruction, claiming that she was denied her due process right to a fair trial. Specifically, she argues that the court diluted the state's burden of proof by improperly instructing the jury that "[t]he first issue that you must resolve is whether the defendant used deadly or nondeadly force. This is a question of fact for you to decide after a full consideration of the evidence." According to the defendant, because the court's instructions as a whole are rife with the reasonable doubt standard of proof, the court's failure to include it in this one instance misled the jury into applying some other standard.

On the basis of the charge as a whole, we conclude that the court's instruction on self-defense presented the case to the jury in such a manner that no injustice resulted. The court provided a general charge to the jury in which it specifically instructed that the only standard of review that the jury was to apply was that of proof beyond a reasonable doubt. At no time did the court instruct the jury to apply any other standard, and, throughout its charge, the court instructed the jury repeatedly to apply the proof beyond a reasonable doubt standard. The court further emphasized that the state bore the burden in proving both the elements of the charged crime and in disproving the defendant's claim of self-defense. Nothing in the court's instructions evinced a determination under any other standard of review. Accordingly, we conclude that the court's instructions did not mislead the jury and, thus, this claim fails under *Golding*'s third prong.

B

The defendant also claims that the court's instructions violated her due process right to a fair trial by referring to Devane as "the victim." We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. The court used the term "victim" ten times in its charge to the jury. Nine such references were made in the context of its charge on self-defense. The court referred to Devane as "the alleged victim" in the context of its charge on the irrelevance of sympathy, prejudice and punishment. That sole reference preceded those that appeared in the self-defense charge.

Conceding that her claim is unpreserved as a result of her failure to take exception to the court's instructional reference or covering such in her request to charge, the defendant seeks to prevail under *Golding*. We review the defendant's claim because the record is adequate for review, and her claim that she was denied a fair trial due to the court's alleged instructional error is of constitutional magnitude. See *State* v. *Eric M.*, 79 Conn. App. 91, 99, 829 A.2d 439 (2003) (right to fair trial is fundamental liberty secured by fourteenth amendment), aff'd, 271 Conn. 641, 858 A.2d 767 (2004). Accordingly, we turn to the third prong of *Golding*.

Preliminarily, we note that our analysis of the defendant's claim requires application of the same standard of review as applied in part II A of this opinion. In particular, "[t]he test to be applied . . . is whether the charge . . . as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Makee R.*, supra, 117 Conn. App. 198.

"The appellate courts of this state have had occasion to consider the ambiguous nature of the term victim. In *State* v. *Cortes*, 84 Conn. App. 70, 86, 851 A.2d 1230

(2004), aff'd, 276 Conn. 241, 885 A.2d 153 (2005), this court held that the trial court's pervasive use of the term in its jury charge deprived the defendant of a fair trial. . . . This court reasoned: In cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term victim is not inappropriate. In cases in which the fact that a crime has been committed is contested, and where the court's use of the term victim has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief that a crime has been committed against the complainant." (Internal quotation marks omitted.) *State* v. *Santiago*, 100 Conn. App. 236, 252–53, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 152, 153 (2007). In our analysis, "[w]e also ask whether any prejudicial effect of the court's use of the term 'victim' was negated by the court's other instructions to the jury." *State* v. *Cortes*, supra, 87.

Relying on *Cortes*, the defendant claims that the court's use of the term "victim" undermined her claim of self-defense, deprived her of the presumption of innocence and infringed on the jury's function as the finder of fact. The defendant argues that the most critical determination that the jury had to make was whether she acted in self-defense. As the defendant correctly points out, if she was justified in her conduct, Devane could not have been a victim because his death would not have constituted a crime. By using the term "victim," the defendant contends, the court communicated to the

jury its belief that the defendant did not act in self-defense, thereby infringing on the jury's duty to determine if Devane was a victim of a crime and if, in fact, a crime had been committed.

Upon our review of the court's instructions as a whole, we conclude that it was not reasonably possible that the jury was misled by the court's use of the term "victim." The court began and ended its instructions by referring to Devane by name and did not refer specifically to him as "the victim," except on one occasion. On that occasion, the court referred to Devane as "the alleged victim," making clear that it passed no judgment as to whether Devane was or was not the victim of a crime. Moreover, the court stated that it had no preference as to the outcome of the case, that its sole task was to apply the rules of evidence and charge the jury on the law and that it was the jury's task to decide the outcome. Any potential harm by the court's use of the term "victim" was further negated through its final instructions accurately describing the defendant's presumption of innocence. See *State* v. *Lemay*, 105 Conn. App. 486, 493, 938 A.2d 611 ("[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them" [internal quotation marks omitted]), cert. denied, 286 Conn. 915, 945 A.2d 978 (2008). Accordingly, the defendant's claim fails and, thus, fails under *Golding*'s third prong.

## III

Finally, the defendant claims that the court improperly denied her motion to suppress statements that she made prior to being advised of her constitutional rights. We disagree.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed

unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602,16 L. Ed. 2d 694 (1966). Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 361, 952 A.2d 784 (2008). The burden of proving custodial interrogation lies initially with the defendant. See, e.g., *State* v. *Doehrer*, 200 Conn. 642, 647, 513 A.2d 58 (1986).

"To determine whether a suspect is in custody so as to require *Miranda* warnings, we inquire whether a reasonable person, in view of all the circumstances, would have believed that he or she was not free to leave. . . . The term interrogation under *Miranda* is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. The police, however, cannot be held accountable for the unforeseeable results of their words or actions. . . . Voluntary statements of any kind are not barred by the fifth amendment.

*Miranda* v. *Arizona,* supra, 278." (Citations omitted; internal quotation marks omitted.) *State* v. *Medina,* 228 Conn. 281, 289–90, 636 A.2d 351 (1994); see also *State* v. *Copeland,* 205 Conn. 201, 208, 530 A.2d 603 (1987) (officer's request that defendant hand over clothes not reasonably likely to elicit defendant's subsequent incriminating response).

Notwithstanding these procedurals safeguards, "[g]eneral on-the-scene questioning . . . of citizens in the fact-finding process is not affected by [*Miranda's*] holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (Internal quotation marks omitted.) *State* v. *Szabo,* 166 Conn. 289, 293, 348 A.2d 588 (1974); see also *United States* v. *Dunnings,* 425 F.2d 836, 838 n.1 (2d Cir. 1969) (questioning defendant about identity of white powder when executing search warrant was general on scene questioning, expressly excepted by *Miranda*), cert. denied, 397 U.S. 1002, 90 S. Ct. 1149, 25 L. Ed. 2d 412 (1970); *State* v. *Bennett,* 171 Conn. 47, 53, 368 A.2d 184 (1976) (routine investigatory information gathering not focused on defendant as accused does not constitute custodial interrogation).

The following additional facts are relevant to the defendant's claim. On December 11, 2006, the court held a hearing in which it denied the defendant's motion to suppress several statements she made from the time that officers first arrived at her apartment complex through her being advised of her constitutional rights at police headquarters. At that hearing, Fiumidinisi testified that when he arrives at the scene of a crime, he often finds family members of the injured there trying to assist that person. Fiumidinisi indicated that any witness or suspect would have been questioned as part

of the investigation before being permitted to leave. When Fiumidinisi, upon arrival, saw the defendant cradling the victim, he thought it possible that the defendant and the injured victim were related and testified that "it would have been [his] intention to interview [the defendant] because she was there with a person who was injured." Only after the defendant exclaimed that she had stabbed the victim was she arrested. In denying her motion, the court concluded that although the defendant was in custody for purposes of *Miranda*, she was not interrogated. Specifically, the court reasoned that questions concerning the victim's identity amounted to general on the scene questioning, which does not invoke the warnings required by *Miranda*.[4] The defendant now argues that the court improperly denied her motion to suppress these statements.[5] The defendant contends that Payne and Fiumidinisi knew or should have known that their questions concerning the identity of the victim were likely to elicit an incriminating response from the defendant.

On the basis of the facts of the present case, we conclude that the defendant was not "interrogated" within the meaning of *Miranda*. The court's conclusion that Payne and Fiumidinisi's questions as to the victim's identity amounted to no more than general on the scene questioning not reasonably likely to elicit an incriminatory response finds ample support in the record. Even though Payne and Fiumidinisi heard the defendant exclaim, "[w]ake up, wake up; I did not mean to do it,"

[4] The court stated: "The question [as to the victim's identity] . . . is not the sort of thing when officers arrive on the scene [that] would reasonably be expected to elicit an incriminating response. The officers to this point are just trying to sort things out. And, obviously, with a dead or dying person on the scene, there's not a lot of time for the officers to thoroughly analyze this before commencing questioning of the sort they did here."

[5] The defendant limits her claim to statements she made in direct response to questions about the victim's identity.

their subsequent questions were not focused on the defendant as an accused. Their questions were essentially protocol upon arriving at the scene of a crime. Having seen the defendant cradle the victim, Payne and Fiumidinisi reasonably believed that the two may have been related or that, at the very least, she knew his identity. The defendant was not asked about her involvement, if any, in the crime. Nevertheless, after identifying the victim, the defendant volunteered that he "came at [her]" and that she had "stabbed him." The defendant's responsive statements were unforeseeable and, thus, not barred by the fifth amendment. Accordingly, the defendant's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.